THE F. & T. LUPTON.

(District Court, S. D. Georgia, E. D. July 9, 1910.)

SHIPPING (§ 132*)—LIABILITY FOR DAMAGE TO CARGO — HARTER ACT — "SEAWORTHINESS."

Evidence *held* to sustain the burden resting on the owners of a schooner to show that, before she started on a voyage from New York to Brunswick, Ga., with a cargo of cement, they exercised due diligence to make her "in all respects seaworthy and properly manned, equipped, and supplied," and that under Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), she was not liable for damage to cargo from sea water; the evidence showing that she was in fact in first-class condition at the beginning of the voyage, and that the leakage was caused

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

by very dangerous storms she encountered, which started some of her seams.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 484; Dec. Dig. § 132.*]

In Admiralty. Suit by the Carolina-Portland Cement Company against the schooner F. & T. Lupton. Decree for respondents.

Bryan & Bryan, Crovatt & Whitfield, and Walter G. Charlton, for libelant.

Bennet & Conyers and Garrard & Meldrim, for respondents.

SPEER, District Judge. This is a libel filed by the Carolina-Portland Cement Company against the schooner F. & T. Lupton for the recovery of $6,600, for alleged damage to a cargo of cement. The Lupton sailed from New York for Brunswick, Ga., on the 3d of June, 1906. Her cargo consisted of 1,300 tons of vulcanite Portland cement, shipped in 1,000 barrels and 23,156 bags. The cargo was consigned to the libelant. It is alleged in the libel that the injuries—

"arose, not from any danger or peril of the sea or navigation, or from any cause excepted against in the bill of lading, but by the carelessness, negligence, improper conduct, and want of attention on the part of the said master, his mariners, and servants," and "was occasioned by water, which was permitted * * * to remain in contact with said cargo until, through the action of the said water thereon, the same was damaged in its value to the extent * * * pleaded."

The Lupton reached the port of destination on June 22, 1906. Then it was discovered that there was considerable damage to the cement shipped in the sacks and to that shipped in the barrels. There was also a claim for the cost of 2,600 new sacks required to resack the cement, and for 1,005 old sacks and 869 old barrels, which were destroyed. There is a claim, also, for $265.24 for labor, and $154.95 expended to recondition the damaged portion of the cargo. In the conclusion the court has reached as to the rights of the parties, it is not deemed essential to state the claims of damage in more detail.

The respondents in their answer admit the material allegations of the libel as to the injury, but deny responsibility therefor. They deny that it was caused by the negligence of the master or crew, but they insist that the damages resulted from the dangers and the perils of the sea, and not from any cause which might have been avoided. Specifically the defense is:

"That on the morning of the 11th of June, 1906, * * * the weather was cloudy and rainy, and heavy seas began running, and strong winds blowing, and these conditions of weather continued during the 11th, 12th, 13th, and 14th of June, 1906, the sea maintaining its great force during said days, though the wind varied from time to time in strength; the sea breaking clear over the said schooner, decks, and hatches, causing the said schooner to roll and pitch heavily. During the 18th of June, 1906, the said schooner encountered also very heavy seas, the water washing over her decks.

"That the schooner was equipped, not only with hand pumps, but with a steam pump, and these were all properly manned and operated, and kept in service during the entire voyage. That during the prevalence of the storm on the 11th, 12th, and 13th of June, 1906, the pumps were going all the time, the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

vessel making some water, not serious, and on the 14th of June, 1906, while the storm still prevailed, the vessel was laboring heavily, and about 4 p. m. she was pumped out, finding some water, not serious, and at 5 o'clock a. m. the pumps were tried again, with the same result, and the vessel was brought to anchor because of insufficient wind, about four miles from Frying Pan Lightship, the seas running with great force, causing the vessel to roll and pitch heavily. At or about 7:40 a. m. on that morning the master discovered that the vessel was leaking badly, caused by heavy seas and the laboring of the schooner therein, and had about 28 or 30 inches in her hold, and at once the steam pump was started, and the vessel freed of water, and on searching for the leak, which was done immediately, it was found that the vessel had sprung a serious leak in her centerboard well. Thereupon, after moving several tons of cargo, said leak was gotten at and temporarily stopped and repaired, so that the vessel could proceed on her voyage. That, with the use of the pumps until the vessel reached Brunswick, little or no water continued to enter the vessel, and that upon her arrival her hatches, properly covered with tarpaulins and battened and caulked with oakum, were tight and sufficient."

To this answer an amendment is filed, in which the respondents claim the benefit of the Harter act, and alleged full compliance with all the conditions which entitle them to that benefit.

The third section of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) provides in part as follows:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible from the damage or loss resulting from faults or errors in navigation or in management of said vessel."

The duty of the owners to exercise due diligence in making the vessel seaworthy, and fitting her out with the appropriate crew and equipment, is undeniable. If this has been done, it is equally clear that they are relieved from responsibility for damage or loss resulting from faults or errors in navigation or in the management of the vessel.

Here the libelants do not charge that the vessel was unseaworthy at the beginning of her voyage, but allege that the injuries to the cargo arose—

"by the carelessness, negligence, improper conduct, and want of attention on the part of the said master, his mariners, and servants."

By amendment to the libel it is further alleged that the injury—

"was occasioned by water which was permitted through the carelessness, negligence, and improper conduct of such persons to remain in contact with said cargo."

It may be questioned whether the averments in the libel as amended are sufficient to avoid the protection to the shipowners contemplated by the Harter act. But a less questionable ground of defense is discoverable in the evidence.

In order to obtain the benefit of the Harter act, the burden of showing the seaworthiness of the vessel is in all cases upon the owners. It is, therefore, incumbent upon the shipowner to show that a due and proper inspection had been had, and the vessel ascertained to be in all respects seaworthy and fit to carry the cargo which she had undertaken to transport, or that due diligence to that end had

been used. The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794, opinion by Mr. Justice Day.

The definition of "seaworthiness" adopted by the Supreme Court, may be found in the case of The Southwark, 191 U. S. 8, 24 Sup. Ct. 3, 48 L. Ed. 65:

"The test is  *  *  * whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport."

In this case, while there are conflicts in the evidence, and while conflicting views have been urged by counsel, it is made plain that the Lupton was inspected just previous to her voyage; that she was shown to be in first-class condition; that shortly after this voyage she discharged in perfect order at other ports cargoes of lumber, and, what is more illuminative in an evidential sense, a cargo of dry salt. This testimony may be found in the depositions of the master, A. P. Longstreet. He testified that:

"The next cargo after this damaged cargo was a cargo of lumber from Brunswick to New York. The next was a cargo from New York to Port Royal, S. C., of salt in bulk, loaded on the vessel's skin, without damage, and delivered in perfect order."

This was soon after the cargo of cement was discharged in Brunswick. A cargo of salt is especially perishable if the vessel leaks. This witness testified that after the injuries to the cement, and before the cargo of salt was safely carried, the vessel had undergone but slight repairs in Brunswick, and none in New York. It appears that the cargo was properly stowed and dunnaged with the usual precautions, and the hatches caulked and protected; that there were four hand pumps, and two steam pumps, which were in steady and effective use after the vessel started leaking below Hatteras. The master had been in command of the vessel since 1888. When she was eight or nine years old $15,447 was spent upon her for new timber, new planking, partly new decks, new bowsprit, and new sails. She was caulked and painted throughout, and everything was done necessary to put her in first-class shape. Vessels are rated for a term of 15 years, and this inspection was done by Capt. Humphrey, of the Bureau of Shipping, at what is called "the half time survey." At the end of the 15-year period, in 1903, the master testified that she was again thoroughly overhauled under the direction of the government inspectors, that the bottom was caulked and painted, and carpenter work done, the work costing $3,300. In addition to these expensive repairs, she was hauled out from one to three times every year, and a general overhauling given her.

As to her condition just before the voyage, he testified that she was examined at Brown's dry dock in Jersey City in May, 1906. This was only two weeks before she sailed. The repairs then made he described as follows:

"We hauled her out in dry dock; tried her caulking on the bottom first. We unhung her rudder, and made necessary repairs around there, looked after her rudder board inside and out, also painted her with copper paint to light water, and the caulking was all tried throughout the bottom. The center-

board trunk was also thoroughly examined and tried under her bottom. They also did work on the inside in various parts of the vessel, such as fixing hatch combs, the centerboard well, etc."

A total of $1,000 was spent upon her. Capt. Proctor, of the American Shipping Bureau, came aboard to inspect the vessel, and she immediately afterwards set sail for Elizabethport to take the cargo now in question. When she left the dry dock at this time, the master testified:

"She was in condition to carry any cargo to any part of the world. She was fully equipped for any voyage that might be cut out for her."

Relative to her general fitness he testified that in the life of the Lupton she had never delivered a damaged cargo up to the time she delivered this cargo at Brunswick; that her timbers were very heavy and large, with beams as large as vessels now being built to carry 2,000 to 2,200 tons; and that no worms had ever been found in her bottom. He further testified that the deck was in a seaworthy condition all the time, and that no water came into the hold from the deck during the rain while the vessel was discharging.

This testimony was corroborated by that of Thomas Esnoul, the engineer. He testified to the good condition of the pumps, which could each work independently, and that the cargo had 15 or 16 inches of dunnage all about it, and 4 inches of planks "on the side in the wings" that distance from the skin of the vessel for the protection of the shipment. The hatches were well fixed, they put strong pickets on, and put the hatches on and two tarpaulins over it, and that "after they fasten these tarpaulins down, they won't blow away."

Leo, the port warden at Brunswick, went aboard the Lupton officially immediately after the voyage in controversy; was present when the hatches were taken off. "They were secured and well battened." He said that he "found them well caulked and well cemented. I found good caulking and good, dry oakum." He made a careful examination by going down into the hold, and crawling about with a lantern to find out if there was any place where the vessel had leaked through the deck. He found the leak somewhere in the seams about the centerboard well. It was his official duty to see if any of the cargo was wet on top. He located the damaged and hardened cement right opposite the leak, and said, "That is where the water came through."

The thoroughness of the repeated inspections is shown by the testimony of Joseph W. Proctor, a marine surveyor connected with the American Bureau of Shipping. He testified that he had inspected the Lupton twice, the first time in February, 1906. He gave her a certificate of classification as "A—1" for the term of three years from that date. This certificate concludes with the words: "And is deemed fit to carry dry and perishable cargo." This is signed by the officers of the insurance company, and by Proctor, the surveyor.

This witness also testified that on May 10th and 12th, just two weeks before the voyage, he examined the Lupton at Brown's dry dock at Jersey City. The examination was in the regular course,

he having been notified that the vessel was being dry-docked. His testimony is:

"I looked all over the vessel inside; went all through her, to see if there was anything that showed any signs of weakness; tried the caulking about the vessel. I found everything in good condition. The only thing that wasn't was the rudder, and that was put in good condition. The caulking was good. I tried it myself, exposing some and testing its condition."

This testimony seems especially valuable, in view of the testimony that the leak was caused in the seams of the centerboard, by the caulking giving way in the heavy seas. This witness also testified that the oakum was so good that it could not be started. "There was nothing to be desired by the inspectors."

Lawrence, the mate, substantially corroborated the testimony of the master as to the condition of the vessel before leaving New York. Strang, a ship carpenter at Brown's dry dock, corroborates Proctor. There was a little uncertainty as to the date of his repairs. He testified that his examination was in 1905, and Proctor said that it was in 1906. But there is unanimity of several witnesses that the last examination was in May, 1906, and indicates this to be the fact without justly evoking any question as to the candor of the witness Strang.

This recital makes it very clear to the mind of the court that the owners of the Lupton have fully sustained the burden to show seaworthiness, as that is defined by the Supreme Court. The evidence is equally overwhelming that the Lupton, on her voyage to Brunswick, encountered dangerous and destructive storms. The reports of the Weather Bureau indicate stormy weather along her course. I. R. Fenimore, master of the schooner Jennie Sweeney, sailed from Philadelphia to Mayport, Fla., at the same time as the Lupton sailed for Brunswick. He describes the weather as stormy, with heavy seas; his vessel laboring heavily. She finally sank on the 13th of June, and he was saved by the schooner Maggie Keough.

The testimony of Longstreet, the master, and of the mate, indicates very rough weather. They were two days trying to get around Hatteras; the vessel laboring heavily. They both testify to a bad cross-sea. The evidence fully sustains the relating averments of the answer already set forth.

To meet this mass of evidence, there is no adequate proof to indicate that the vessel was unseaworthy at the inception of the voyage. Three witnesses, it is true, testified that when she arrived at Brunswick she had stains on her decks of cement, that there was water in her hold, and the like. This, however, was after she had gone through the perils of the storm, after she sprung two leaks, and after the pumps had been working constantly. It is not impossible that the cement may have been brought on deck through the action of the pumps, as confessedly it was injured by the leaks, which were obviously sprung through the straining of the vessel in the rough seas and the cross-seas.

The conclusion of the court is that the owners of the Lupton are entitled to the benefit of the Harter act, and that the decree should be for the respondents, with costs.