**THE ORITANI.**

No. 111 of 1925.

District Court, E. D. Pennsylvania.
Dec. 11, 1929.

Bailey & Single, of New York City, and Otto Wolff, Jr., and Lewis, Adler & Laws, all of Philadelphia, Pa., for plaintiff.

H. H. Yocum, of Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

On the night of April 21, 1925, at 11:45 o'clock, the steamship Oritani, leaving the harbor of Port Morant, Jamaica, with a cargo of bananas bound for Philadelphia, stranded upon a coral reef near the entrance of the harbor. She remained fast on the reef until 4:45 in the afternoon of the following day, at which time she was pulled off by a wrecking tug and then proceeded under her own power to Kingston, where she was laid up several days for repairs made necessary by the stranding. In order to float her it had been necessary to jettison part of the cargo, and, owing to the fact that ventilation in the hold was entirely dependent upon the vessel's forward motion, the remainder of the bananas began to ripen rapidly. As a result of the stranding it became necessary in the interests of all parties concerned to sell the cargo at Kingston. The salvage was trifling and the cargo may be considered as almost a total loss.

This is an action in rem by the Atlantic Fruit Company, Limited, owners of the cargo, against the vessel to recover damages for the loss of the cargo. An answer has been filed by the Ormes Steamship Company, Limited, of Montreal, Canada, claimant and owner of the vessel. At the time of the stranding, the Oritani was under a seven months' charter to the Atlantic Navigation Corporation, which for the purposes of this suit is the same corporation as the Atlantic Fruit Company, Limited, the libelant.

The theory upon which the action proceeds is that under the third section of the Harter Act (27 Stat. 445, 46 USC § 192 [46 USCA § 192]) if the vessel was unseaworthy in any particular at the beginning of the voyage, the owners are responsible for the loss of the cargo without regard to whether the stranding was directly or indirectly caused by such unseaworthiness. The libelant's position is based upon the decision of the Circuit Court of Appeals for the Third Circuit in The Willdomino, 300 F. 5, 11. In that case the court held that: "If the carrier fails to meet that burden [the burden of proving the ship seaworthy when she sailed] he is liable for damage to the cargo resulting from negligence of the master and crew in the naviga-

tion or management of the vessel, and the carrier is so liable wholly without regard to whether or not there was any causal connection between the lack of due diligence to make the ship seaworthy in all respects and the loss caused by the negligence in navigation or in the management of the vessel." The claimant has presented an interesting and forceful argument in which he challenges the soundness of the rule so stated; to which argument might have been added the suggestion that in the Willdomino Case there was at least a remote causal connection between the unseaworthiness and the stranding, in that the shortage of fuel which was held to have rendered the vessel unseaworthy required a deviation from her course which took her into the difficult waters in which she stranded. [1-3] These considerations, however, are for the Circuit Court of Appeals, should the matter be presented to them. There can be no mistake about what was decided in the Willdomino Case, and I am bound to follow it. The interpretation placed upon the third section of the Harter Act in that decision is contained in the following propositions, which are correctly stated by the libelant in his brief: (1) That the exercise of due diligence by the vessel owner is a condition precedent to the operation of the exemptions contained in the act; (2) that the burden of proving the exercise of due diligence is upon the vessel owner; and (3) that the due diligence must have been exercised in all respects wholly without regard to any causal action between the vessels wholly without regard to any causal action between the vessel's seaworthiness and the subsequent loss. To these rules may be added the following corollaries, applicable in the case now before the court but not covered by the Willdomino decision: (4) That if the owner accepting the burden of proof shows that the vessel at the time of sailing was in point of fact seaworthy in all respects and properly manned, equipped, and supplied, he will be held to have exercised the due diligence required by the statute, and will be entitled to exemption from responsibility for faults of navigation; (5) that upon the question of seaworthiness at the time of sailing, evidence of the condition and performance of the vessel and her mechanical equipment during the subsequent voyage may be considered. The last of the propositions above stated disposes of the libelant's criticism of what he terms ex post facto evidence of seaworthiness. Retrospectant evidence is always relevant to prove a fact and is universally accepted both in law and in the ordi-

nary conduct of human affairs as having probative value. See The F. & T. Lupton (D. C.) 182 F. 144.

■ In dealing with facts of this case, the first inquiry is as to the cause of stranding. "Dangers and accidents of the seas" may be eliminated. At the time of the accident the weather was clear and fine, the wind was light, tide low, and the sea smooth with a slight swell. The facts with relation to the cause of the stranding are found to be as follows: The Oritani, having loaded bananas at Port Antonio, Port Morant, Manchioniel, Morant Bay, and Kingston, left Kingston at 7:30 p. m. on April 21, and at 11 o'clock p. m. on the same night anchored in the open harbor of Port Morant for the purpose of discharging stevedores who had been taken on at Port Antonio. She had on board a pilot, an employee of the Atlantic Fruit Company, the libelant, who had joined the ship at Port Antonio. At 11:30 p. m., the laborers having been discharged, the pilot hove up the anchor, turned the ship around, straightened her on her course out of the harbor, and then, either upon his own suggestion or at that of the master, left the ship and went ashore. Thereafter the navigation of the ship was in charge of the master. Captain Anderson, the master, was thoroughly familiar with the harbor of Port Morant, having come out of it five or six times as master and dozens of times as second and chief officer, both by day and by night. The course out is perfectly straight through a channel which narrows to about 250 yards, guarded on either side at that point and at the wider entrance by reefs. A stake with a green light marks the anchorage near which the Oritani anchored. A red light buoy, known as the inner buoy, is located in the channel about eleven or twelve hundred yards to the south of the Oritani's anchorage, and a second red buoy (not lighted) is at the entrance to the harbor approximately 700 yards further south. From the Oritani's anchorage, if a straight course south one-half west or 186 degrees true is taken, passing both inner and outer buoys on the vessel's port side, and continuing until the Point Morant light becomes visible from the west, the ship will be clear of all obstructions and can then safely be headed east or west. This involves keeping her steady on her course out of the harbor to a point at least two miles beyond the outer buoy. It is the proper and safe method of navigating out of the harbor of Port Morant, generally accepted and recognized as such. On the night of the stranding, Captain Anderson did not hold this course, but, on reaching the first or inner red buoy, changed his course to the eastwardly and in a very few minutes had his ship on the reef on the eastern side of the channel near its mouth. I find as a fact that the stranding of the Oritani was directly and wholly due to fault in the navigation of the vessel by its master. The fault lay in departing from the proper, safe, and well-known course out of the harbor and setting a course which was bound to put the ship on the reef.

At this point, it is necessary to say a word about the testimony of Captain Anderson. He testified that when the pilot left the ship, he rang full speed ahead on the ship's telegraph, glanced into the compass and noted the heading, and told the man at the wheel to hold her "steady as she goes." When the red light of the inner buoy was about three points abaft the port beam and about 100 yards off the ship, he ordered the course changed to south by east. It appeared to him that the ship's head was swinging too much to port, and as he turned to look into the compass the ship struck. If the ship had stood on a compass leading south by east, she would have cleared the reef upon which she stranded, and his conclusion therefore was that the compass must have been defective. It is probably true that if the ship had actually been placed upon the heading south by east, and kept there, she would have passed the reef by a narrow margin. Even this fact is somewhat doubtful, as it assumes that she was in the precise position testified to by the captain when the change was made, absolute accuracy in placing and keeping her on the heading, and absence of currents, tidal movements, and other adverse conditions.

However, I reject the testimony of Captain Anderson as wholly unworthy of belief upon this and all other controverted points. A comparison of the numerous sworn and unsworn statements which he gave at various times makes it quite impossible to give his testimony the slightest weight. His deposition was taken January 24, 1928. During the greater part of the preceding year he had been in the employ of Messrs. Single & Single, counsel for the Atlantic Fruit Company, libelant, and proctors in this cause, as an investigator of marine cases, at a substantial salary. On February 1, 1927, and while out of a job, he made a sworn statement indicating that the stranding was caused by a defective compass. That was just before he entered the employ of the libelant's counsel. Six months earlier, he had made a sworn statement to the same effect. A year prior to that, in September, 1925, he had said in a

sworn statement given to the owners that: "The accident in Port Morant was not caused or contributed to in any way by any compass defects or lack of information with respect to compass deviations or variances. * * * It was an error of navigation to have altered my course when I passed the red buoy, and the ship struck because of this error." In July, 1925, he said in a letter written to the owner's manager from Tampico, Mexico, that the compasses were "very relyable," and in his report of the accident to the company on July 6, 1925, after stating that he changed his course because he thought he was clear and was anxious to make time by saving mileage, said, "I deeply regret this accident to your ship for which I must accept full responsibility." These earlier statements were made at a time when he was in hope of being re-employed by the Oriental Navigation Company, in which hope he was probably being encouraged by agents of that company. He explained them by saying, "I stretched my statements quite a lot in order to be on the right side of the owners." In his testimony before the Marine Board of Inquiry at Kingston, April 25, 1925, he said, "I never had experience to find my compass in this ship defective." In a sworn statement given the day after the accident, he assigned "apparently defective compass" as the cause of the accident, and finally, in conversation with the other officers immediately after the stranding, he took the whole responsibility and attributed the accident to his altering his course too soon. Under the circumstances, counsel for the libelant has very little to complain of if the court merely declines to accept the testimony of their witness without further comment.

This brings us to the fundamental issue in the case, namely, the seaworthiness of the Oritani. The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport. The Silvia, 171 U. S. 462–464, 19 S. Ct. 7, 43 L. Ed. 241. In determining whether or not the exemptions of the Harter Act are in force, the point of time at which the test of seaworthiness is to be applied is the commencement of the voyage. The International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130. The libelant in this case invokes the doctrine of voyage by stages, and contends that under that rule even if, by meeting the requirement of the Harter Act, the owner has acquired at the commencement of the voyage a status of freedom from liability for negligent operation, he loses that exemption if at the beginning of any subsequent stage of the voyage the vessel is unseaworthy. The interpretation placed upon the doctrine of voyage by stages in The Steel Navigator (C. C. A.) 23 F.(2d) 590, 592, makes it clear that this is a mistaken view of its effect. The court there pointed out that this rule simply means that when the demands upon the vessel change as the voyage proceeds, she satisfies her covenant if she is fitted out in port for that leg of the voyage immediately following. The court said: "However, it is essential to observe that, instead of imposing new burdens on the ship, it relieves her of what would otherwise be her duty, construed with verbal strictness. Especially is it necessary to remember that the measure of what can in any event be demanded of her is her fitness for the whole voyage as contemplated at the outset. Adjustments made necessary by subsequent events pertain to her management and cannot touch her seaworthiness." While the above statement was made with regard to the covenant of seaworthiness and not to the Harter Act requirement for exemption, it is sound law as applied to the latter, particularly in a case such as this in which the owner has elected to make actual seaworthiness rather than due diligence the issue. In this case the time on April 21, 1925, when the Oritani left Kingston harbor is the point at which her seaworthiness is to be determined. At that time she had taken on all of her cargo and was ready, so far as stowage of the cargo and equipment for the voyage were concerned, to sail for Philadelphia. The fact that thereafter she dropped anchor in the Port Morant Roadstead for half an hour to discharge stevedores does not have the effect of making a new stage of the voyage begin at that point. See Palmer & Parker Co. v. United States (D. C.) 10 F.(2d) 214.

In 1925 the Oritani was a comparatively new vessel, having been built at Brooklyn in 1920–21. She is 227.3 feet in length, 33.7 feet in beam, 21.3 feet in depth, of 1,396 tons gross register, and 790 tons net register. After a voyage to Baracoa, Cuba, terminating July 31, 1924, she was laid up in dry dock until March 27, 1925, on which date she went into commission under the charter which was in effect at the time of her stranding. In the early part of March, 1925, she was surveyed by Lloyd's surveyors. This survey included a thorough examination of hull and machinery. Between March 11, 1925, and March 27, 1925, such repairs as were recommended by the surveyors were effected, and

the Oritani was then classed by the surveyors 100–A–1, the highest rating, and inspection certificates were issued certifying to her fitness to carry dry and perishable cargo. The repairs consisted of cutting out and renewing a number of defective rivets in the shell plating of the deep tank, making good a few rivets in the double bottom tanks, and some trifling minor repairs. After the repairs, the tanks were tested and proved good and tight. There is considerable detailed testimony which is not controverted by the libelant, except in the points hereafter noted, going to establish that when the Oritani sailed from New York for Port Antonio, April 15, 1925, she was in all respects seaworthy, properly manned, equipped, and supplied. She was again inspected at Kingston on April 21, and given a coast certificate; and there is nothing to show that there had been any subsequent change in her condition when she left Port Morant on the night of April 21st.

■ The first particular in which the libelant contends that the Oritani was unseaworthy is with respect to her compass or compasses. (There were two compasses, the steering compass and the standard compass, but they were checked one against the other from time to time, and, as there is no evidence of any difference of performance between them, the same consideration applies alike to both.) This, in turn, divides itself into two parts: First, mechanical defects in the compass; and, second, want of sufficient compass data.

Taking up the matter of mechanical defects: The evidence upon this point consists of three kinds of testimony: (1) The testimony of a manufacturer and adjuster of nautical instruments who took the compasses of the Oritani in March, 1925, while she was in dry dock, repaired the standard compass, and delivered them back to the steamship. He testified that, when delivered, they were in good mechanical condition. (2) The testimony of various officers of the ship (other than Captain Anderson) who used the compasses on the voyage from New York to Port Antonio as navigating instruments. The testimony of these witnesses is unanimous to the effect that the performance of the compasses was efficient and satisfactory. The fact (if it be a fact) that on reaching Watling Island the ship was found to be a few miles (10 to 15) out of her course is of very little weight, as against the positive testimony of the ship's officers. Two of these officers took observations for deviations at least daily and usually oftener. (3) The testimony of experts in navigation, who had never seen the compasses in question, but who reached certain conclusions drawn from the deviation record made on the voyage from New York to Port Antonio and also during voyages made in the preceding year. From these witnesses comes the only testimony to the effect that there was anything mechanically wrong with the compasses.

The expert testimony deals with three possible mechanical defects, as follows: (1) Erratic behavior. All the witnesses agree that compasses in use on shipboard will always show a certain amount of deviation; that is, the needle will rarely point absolutely true and there will always be some angle between the magnetic and the true meridian. This error is due to the magnetic influences of the earth, magnetic influences set up by hard iron magnets within the ship (subpermanent magnetism), and magnetism induced in the soft iron of the vessel by the earth's forces. The amount of deviation varies upon different headings. It also varies upon the same heading in different latitudes, but in the same latitude upon the same headings it should be constant within reasonable limits, allowing for inaccuracies of observation and the effect of the rolling of the vessel. Substantial and numerous discrepancies in deviations taken upon the same heading in approximately the same latitude would indicate something seriously wrong. However, the fact is that the deviation book of the Oritani shows a very good record of constant deviation, except for three observations taken about the heading 40 degrees true, which are rather far apart. In view of the otherwise uniform behavior of the compass, these discrepancies may easily be accounted for as due to personal error on the part of the officer taking the observations. On the whole, I find that there is no evidence of erratic behavior of the compass. (2) Sluggishness. None of the witnesses could definitely say that the compasses were sluggish, but two of them were of the opinion that the deviation record shows that they were overcompensated, which defect would in turn be likely to render them sluggish. This means that various magnets placed in the neighborhood of the compass to counteract excessive deviation had, by reason of the gradual decrease in the ship's magnetism through lapse of time, come to exercise a more powerful influence upon the needle than was necessary. This in turn would decrease the directive force from the magnetic pole, and as a result the compass would be slow in following the swing of the ship. This is all theoretical, however, and the direct testimony is that the compasses

actually were not sluggish. Even if they were, it is not a defect which necessarily renders a compass an unseaworthy instrument. Neither of the experts ventured a guess as to the degree of sluggishness which could be inferred from the deviation record. (3) Excessive deviation. It would seem that if the compass deviation is constant and known the amount would be a secondary consideration. However, good navigating practice requires compensation of the compasses from time to time in order to keep the deviation within "practical limits"—a term not very precisely defined by the witnesses on either side. The reason appears to be that, with a deviation of many degrees, if a mistake is made by applying it in the wrong direction, the mistake is likely to be much more serious than if the deviation is only a degree or two. The fact is that the compasses of the Oritani were compensated at some time near the beginning of her career, but not after that. The deviations shown by her book are nowhere in excess of 7 degrees, which is only ¾ of a point, and they are negligible on all but a few headings. Under the conditions of the voyage, I do not find the deviation excessive or the compass unseaworthy on that account.

In view of the positive testimony as to the good mechanical condition of the compasses and their satisfactory operation, and the failure of the libelant to establish the existence of defects from the deviation record, I find that the compasses of the Oritani were mechanically sound and efficient for safe navigation.

The other charge of unseaworthiness arising in connection with the Oritani's compasses is that the compass data on board both at the time she left New York and at the time she hove up anchor at Port Morant was insufficient for the safe navigation of the vessel. As has been pointed out, it is not a matter of great concern that compass deviations exist, provided they are not too large and provided they are not such as to indicate mechanical defects. On the other hand, it is obviously of vital importance that they should be known to the navigator. Since the deviations will differ upon different headings, it is also necessary in order to navigate with safety that there be some knowledge of the deviation on a sufficient number of headings to permit accurate inferences to be drawn as to deviations on unknown headings. The evidence indicates that deviations on at least eight approximately quadrantal headings should be known in order to have a complete record for navigating. There are various ways in which this information can be acquired: (1) The ship may be swung in a circle and observations taken on the sun at a number of points to get the true heading on each of these points for comparison with the compass headings. (2) If, without swinging the ship, in the course of a voyage observations are taken on headings at various points of the compass, the same information will be obtained. (3) Observations may be taken on known ranges and bearings in harbors or along shore lines, and these may be compared with the compass deviations.

It is usual when the ship first goes into commission after its construction to swing the ship and get the compass deviations upon a number of points. These are entered upon a card known as a deviation card, and thereafter observations are taken at frequent intervals daily and entered in the deviation book. It will be seen that as soon as the deviation record becomes reasonably complete the original card will cease to be of much importance except as a matter of convenience. In the case of the Oritani, the only testimony as to the existence of a deviation card comes from Captain Anderson and was to the effect that to the best of his recollection there was in the chart room such a card which was issued when the ship was new. On the other hand, the owners were unable to produce any deviation card, and I find that such a card was not on the ship on the voyage in which the loss occurred, but do not think that its absence substantially affects the issue of seaworthiness.

The deviation book of the Oritani was produced containing a record from March, 1924, down to the time of her stranding. The summary as given by the claimant in his brief is substantially correct as follows: "The observations in the deviation book covered all the headings upon which the vessel ordinarily sailed a compass course on a voyage from New York or Philadelphia to Jamaica and return. They included courses all the way around the compass. There were no observations noted on headings between 60 degrees, approximately N. E. by E. ¼ E., and 153 degrees, approximately S. S. E. ¼ E. There is no observation noted on a heading of 270 degrees W., but there is one on 284 degrees, W. N. W. ¾ W. There is no observation noted on a heading of 315 degrees, N. W., but there is one on 320 degrees, N. W. ½ N. Observations are noted on headings of 360 degrees, N.; 45 degrees, N. E.; 180 degrees, S.; and 225 degrees, S. W. There are observations therefore on or reasonably close

to three of the cardinal points, and on or reasonably close to three of the quadrantals. There are no observations noted on East or South East. The observation nearest Southeast is 153 degrees, (May 3, 1924). The observation nearest East is 60 degrees, (July 9, 1924)."

Suspending judgment upon the question whether this is a sufficient record to enable the master to navigate the ship with safety, we will examine the question whether insufficient compass data at the commencement of the voyage is a matter affecting the seaworthiness of the vessel or whether it pertains to her navigation and management. If it is the latter and not the former, it does not affect the owner's exemption from liability under the third section of the Harter Act.

All authorities agree in treating the whole matter of correction of compass readings (which necessarily includes the obtaining of the requisite data) as a branch of the science of navigation. In the case of the Oritani, the master had always, from the time he left the dock, the means to obtain whatever information as to deviations was needful or advisable in order to complete the compass data. He could have taken observations of charted course at the dock or as his vessel started down New York Harbor. If this did not supply the required data, he could have headed upon the unknown points either within the Harbor of New York or immediately after proceeding to sea. It is difficult to see what act of diligence the owners could have performed beyond supplying him with accurate instruments to obtain this information. If the deviation book was insufficient, it could have been supplemented only by the observations of a navigating officer. The master of a vessel such as the Oritani is always in theory and almost always in fact an experienced navigator. Captain Anderson certainly was. The theory of the law is that the owners are justified in committing all matters of navigation to skillful and experienced navigating officers. Specific instructions to obtain more data would add nothing in the case of a master who is presumed to know how to navigate his ship. The conclusion is that the obtaining of sufficient compass data, or rather the supplementing of an insufficient deviation record, is entirely a matter of navigation, not affecting the seaworthiness of the vessel, so far as concerns the owners' duties in that respect.

 In the case of the Oritani, the libelant assigns a further basis for his contention that lack of sufficient compass data pertained to seaworthiness rather than to navigation. During her lay-up in dry dock before sailing for Port Antonio, the Oritani underwent certain repairs, and changes were made in the location of her soft iron ballast. Now it is a fact that extensive repair operations upon the hull of a ship and changes in the location of masses of iron in her hold will, if near enough to the compass, effect changes in the compass deviation by setting up new magnetic currents in the ship itself. This fact, the libelant argues, called for one of two things from the owners; either complete new compass data or a recompensation of the compass. However, it all depends on whether or not the repairs and changes were sufficient to affect the compass. In this case, I find that they were not, basing my finding on, first, the character of the repairs, and, second, a comparison of the record of the deviations obtained before and after the lay-up. It is obvious that no new data or recompensation is necessary where a few rivets are renewed and slight changes made in the location of ballast at too great a distance from the compass to have any effect upon it.

The general conclusion is that, with respect to her compasses, the Oritani was in all respects seaworthy and properly equipped, and that if there was any want of sufficient compass data, it was due to a fault of navigation not affecting the seaworthiness of the vessel at the time she left Kingston or New York.

 The second particular in which the libelant charges the vessel with unseaworthiness is failure on the part of the owners to supply her with adequate charts, particularly failure to have on board Chart No. 708 issued by the United States Hydrographic Office, which is a chart of Port Morant on a scale of 1 to 12,192, referred to in the testimony as the large scale chart. Captain Yates, who commanded the Oritani for upwards of two years until December, 1923, testified that during that time he had Chart 708. This testimony I accept. The other officers of the Oritani were unable to state whether or not this chart was on board when she left New York in April, 1925. I will assume (although not find as a fact) that Chart 708 was not on board. She had, admittedly, a chart of the coast line of Jamaica from Morant Point to Port Royal, being H. O. Chart No. 1782, on a much smaller scale (1 to approximately 200,000). This chart contains practically all the navigational aids that are supplied by the large scale chart. The buoys for the navigation of the port are

all marked. Directions for entering or leaving the harbor are specified. Reefs are shown correctly, and the principal landmarks designated. It is to be borne in mind that the harbor of Port Morant is only about a nautical mile in length. The course in or out is perfectly straight, indicated by buoys and landmarks. There is nothing lacking on Chart No. 1782 which would affect the safe navigation of a vessel within the waters of Port Morant. The testimony of both navigating officers of the Oritani, together with that of Captain Yates, who had commanded her during a period of two years, and of Captain Proud, who had navigated the waters of Port Morant on many occasions, was in agreement to the effect that H. O. Chart No. 1782 was sufficient. The only testimony to controvert this was from the two experts called by the libelant, neither of whom had ever navigated the harbor. Seaworthiness is fitness for the contemplated voyage. The officers of the Oritani were all familiar with the Port Morant harbor and its surroundings. I find that H. O. Chart 1782 in the possession of a master and officers who were entirely familiar with the harbor of Port Morant was wholly adequate for the safe navigation of the vessel, and conclude that in the matter of charts the Oritani was seaworthy and properly equipped and supplied.

The third particular in which unseaworthiness is charged is that when the Oritani left Port Morant on the night of April 21, she did not have any pilot on board. I hold that this fact does not affect her right to exemption under the Harter Act for the following reasons: First, the point at which in this case seaworthiness is to be determined is when the Oritani left Kingston, and not later. If at Kingston it had been agreed or contemplated that the pilot was to be dropped before the vessel left Port Morant, his absence might be referred to that time, but it is obvious that such was not the case. Whether the pilot, after he had turned the ship around and straightened her on her course out of the harbor, left at his suggestion or at that of the captain, it is clear his leaving had not been arranged prior to that time. Second, leaving harbor without a pilot is at most an error of management or navigation for the master and not the owner is responsible. "The master has entire charge of the navigation of the vessel, which includes the time and manner of leaving port, equally with the course of sailing and the sail to be carried." Hanson v. Haywood Brothers et al. (C. C. A.) 152 F. 401, 402. See also The Humarock (D. C.) 234 F. 716, 728. Third, under the circumstances of this case, the absence of a pilot, even if it can be charged to the owners, did not render the vessel unseaworthy. Captain Anderson was an experienced navigator, thoroughly familiar with the port, having navigated it many times. The navigation was perfectly simple and consisted in keeping the vessel on a straight course until out of danger, and the captain knew exactly how far that was. The pilot had put her on her course. The one buoy was lighted, and any one with the slightest knowledge of navigation could have taken her out.

The libelant attempts to charge the absence of the pilot to the owner, because it appears in the evidence that on other occasions both Captain Anderson and other masters had permitted the pilot to leave in the same way and, by close calculation of the exact times of the pilot's leaving, the owners could have ascertained the fact from the ships' logs. Of course, the Harter Act does not exempt owners from faults of navigation which they themselves commit or which may be said to have been committed at their command by reason of long acquiescence in a known improper practice. To recover on this theory it would be necessary to show, first, that the practice in question was the proximate cause of the loss, and, second, that it was actually known and acquiesced in by the owners. The fact that pilots had left vessels of the claimant before getting clear out of Port Morant harbor might possibly have been discovered from the logbooks, but it would have required a more minute scrutiny than could reasonably be required in view of the facts that the logbooks showed that there was a pilot on board. In this case we have the additional fact that the pilot was supplied by the libelant and was in its employ. Beside, the owner's manager testified that he had no knowledge of any such practice (if it amounted to such) and that the company had given specific orders against it. This testimony rebuts any suggestion of acquiescence.

To sum up: I find that the stranding of the Oritani and the consequent damage to and loss of her cargo was due to fault in navigation of the vessel. I further find that at the commencement of the voyage at Kingston, and also at New York and at Port Morant, the Oritani was in all respects seaworthy and properly manned, equipped, and supplied. It follows that the Harter Act exempts the owners from liability for the loss, and this libel must be dismissed, with costs.

Decree accordingly.