## THE DENALI.
### No. 13642.

District Court, W. D. Washington, N. D.
March 31, 1938.

146

Lawrence Bogle, Stanley B. Long, and Bogle, Bogle & Gates, all of Seattle, Wash., for petitioner.

James W. Ryan, of New York City, Lane Summers, of Seattle, Wash., T. Catesby Jones and Bigham, Englar, Jones & Houston, all of New York City, and Hayden, Merritt, Summers & Bucey, of Seattle, Wash., for Pacific Coast Coal Co. and others.

J. Charles Dennis, U. S. Atty., and Frank A. Pellegrini, Asst. U. S. Atty., both of Seattle, Wash., for the United States.

Lynwood W. Fix, of Seattle, Wash., for Deep Sea Salmon Co. and others.

Thomas E. Geraghty, of Seattle, Wash., for General Petroleum Co.

BOWEN, District Judge.

On May 19, 1935, at 2:44 o'clock a. m., the steamship Denali, owned and operated by the Alaska Steamship Company, and while on a voyage from Seattle to Alaska ports, stranded on a reef off the southeast end of Zayas Island in Caamano Passage, between Zayas and Dundas Islands in British Columbia waters. No lives were lost, but the vessel and her cargo became a total loss.

In this proceeding the owner, alleging seaworthiness of the vessel and freedom from fault, seeks exemption from all liability or in the alternative limitation of liability in respect of the claims of cargo owners. Cargo claimants deny the owner's right to any such relief because of asserted unseaworthiness of the vessel in her compasses, in her charts, and in her division of mates into watches. In no other respect is unseaworthiness asserted, and shipowner and cargo claimants are the only interests seeking relief. The owner has surrendered its interest in the Denali and her pending freight and passenger moneys, amounting to $1,823.29. The alleged total value of the claims of cargo claimants is about $365,000.

■■■ 1. *Compasses.* Cargo claimants strenuously urge unseaworthiness in respect of the compasses (standard and steering), contending that they were mechanically defective and had an excessive unknown deviation caused by retentive magnetism resulting from the laying up of the vessel on one heading during the lay-up period just prior to the stranding voyage.

The compasses were last adjusted by a professional shore compass adjuster on July 21, 1933, when they were found to be in good condition, and that adjuster then made and left on board a deviation card or rec-

ord of the details of his findings. Thereafter the Denali operated in the Alaska trade during the remainder of the 1933 season, after which she was laid up in the owner's West Seattle lay-up yard during the lay-up season beginning early in the fall of 1933. In the 1934 season she was again operated in the Alaska trade and her compasses were said to have been mechanically and magnetically in good condition by her master for that season's last voyage ending October 31, 1934, on which date began her lay-up period between the 1934 and 1935 trading seasons. While lying at the West Seattle yard, the vessel was, during the three-day period from January 31, to February 2, 1935, thoroughly inspected on behalf of the United States Steamboat Inspectors by Mr. Robinson, assistant United States inspector of boilers, and by Capt. Kelly, assistant United States inspector of hulls. At that time she was found in all respects seaworthy and on the basis of that inspection and report of those officials she was granted a new government seaworthy certificate which was unexpired and in effect at the time of the stranding. Capt. Kelly, who examined the standard and steering compasses, testified in some detail as to the method and thoroughness of his inspection, stating that he not only checked the mechanical condition of the compasses, but that he compared the vessel's azimuth or compass books (made by her navigating officers) with the compass adjuster's deviation card of July 21, 1933, with the result that he made no recommendation for repair or adjustment of the compasses. No major repairs likely to magnetically affect the compasses were made on the Denali after the beginning of her 1934–35 lay-up and before the stranding. While at the lay-up yard she was not lying uninterrupted on one heading all the time, but was necessarily shifted from time to time to accommodate the movement of other vessels.

On May 13, 1935, when the Denali was placed in commission for the 1935 season, Mr. Murphy, the owner's superintendent of maintenance, instructed her master, Capt. Healy, to check up the compasses, and he did so about the time the vessel was moving away from her lay-up. The master and second officer thereafter, while the vessel was making her loading moves about the harbor, again made checks of the mechanical condition of the compasses and took cross bearings with the pelorus, one on the Smith Tower and one on the water tank on Queen Anne Hill, and checked the compass with the known heading of W N W. The compasses were also checked with respect to the making good of the vessel's courses to and from the various docks and the several courses run while loading in Seattle. During those moves the vessel's compasses were checked on at least six different headings (3 in the N W quadrant, 2 in the N E quadrant, and 1 in the S E quadrant), and in no case was an error or deviation of more than 1 degree found on any one heading. And the compasses were checked while the vessel was lying alongside the American Can dock (where might be expected the maximum magnetic influence on ship's compasses from magnetic material on a dock) on a known heading of E N E. After all these checks were made, the master found and reported to Mr. Murphy that the compasses were in good condition. Capt. Erlands, in charge of the vessel's stowage, testified that the cargo was properly stowed (with reference to the magnetic cargo's reasonable distance away from the compasses).

On May 16th, soon after commencing the voyage, with all her deck cargo on board and while taking on additional under-deck cargo (powder) from small wooden vessels in Puget Sound off West Point, the ship in accordance with usual good practice in the Alaska trade was swung from W S W to N E, and the master and second officer each separately took azimuths of the sun on 14 headings, including all of those on which the vessel was expected to navigate on her northbound trip. The master and second officer then compared their azimuths and found them "very close together," and in no instance was the deviation of the compasses in excess of 2 degrees. This was after the deck cargo was all on board. During the remainder of the voyage until near the time of the stranding, in accordance with the usual practice, observations were frequently taken to ascertain if there was any change in the deviation of the compasses and no substantial change was found.

The foregoing was established by positive testimony related in open court by witnesses who had personal knowledge or an opportunity for personal knowledge of the actual condition of the compasses and facts about which they testified, and no witness having such knowledge appeared to deny or question that positive proof.

In addition to that, a number of experts testified as to the proper testing and adjusting of compasses and who should do it, and as to retentive magnetism in compasses and how to deal with that. On some important issues there was a conflict among the experts, but, from that expert testimony which by reason of the local and Alaska experience and more intimate knowledge of the witnesses giving it has the greater weight and credibility, and from the other evidence, the court is convinced that any appreciable retentive magnetism acquired by the compasses during lay-up was shaken out by the vessel's movements, such as when backing under her own power during the loading period; that good and safe practice does not require the compasses to be compensated or adjusted by shore compass adjusters at any given periodic intervals, but only when found to actually need such adjustment; that no such adjustments at such intervals were practiced by any ship operators at the port of Seattle; that the usual practice there was to delegate to the master the duty of checking his compasses and determining when in his judgment adjustment by a shore adjuster was necessary; that it was common practice at that port to check compasses while ships were lying alongside docks and that reliable results could be obtained in that way; that the Denali's compasses were properly determined to be and were in good condition for the contemplated voyage and no adjustments by a shore adjuster were then indicated or necessary.

It was further proved that deck cargo of magnetic material such as that carried by the Denali and usually carried by Alaska vessels was expected to have some magnetic effect on the ship's compasses and that the common and safe practice was to swing ship and take azimuths after the magnetic cargo was loaded to determine accurately the extent of compass deviations caused by that cargo, and thereafter to make proper allowance for that known deviation during the voyage, all of which was done in this case; that the making of that deviation allowance during navigation was all that was necessary or proper, and that it was not proper or safe practice to compensate the compasses while affected by magnetic cargo because after discharge of that cargo the compasses would then be out of adjustment; that in the Alaska trade it was the master's duty to check compasses throughout the voyage, which was done on the Denali; that a compass deviation not exceeding 2 degrees on any one heading if known and allowed for is not excessive nor unsafe for navigation.

The Denali's navigators and watch officers experienced no difficulty with the compasses nor with the making good of any of the vessel's courses before the one she was trying to make when the stranding occurred. Just prior to the stranding the pilot in charge of her navigation found that she was being set westerly off her course by strong currents and thereafter he was trying to put her over to the right away from that westerly set, by piloting or "conning the ship" (as experienced pilots do in Alaska inside passages) without relying upon the compasses. This is affirmed not only by the pilot but also by his assistant watch officer, the third mate, and it is not denied by any witness having personal knowledge of the fact. Experienced navigators know and appreciate what is happening when strong currents set their vessels off course and do not confuse that cause with that of possible unknown compass deviation.

The only evidence opposed to the foregoing facts and conclusions is the testimony of certain experts based solely upon hypothetical questions and scientific theory, but the court cannot accept as controlling such opposing theoretical testimony to the exclusion of the direct, positive proof from all the witnesses having any personal knowledge, as to the actual condition and efficient operation of the compasses, especially when such positive proof is fortified by the opinion evidence of those experts having the greater credibility by reason of their more intimate knowledge of local and Alaska conditions bearing upon the condition and functioning of this vessel's compasses.

The case of The Yungay, D.C., 58 F.2d 352, relied upon by cargo claimants, is not controlling of the liability exemption issue here, because there the ship had undergone extensive repairs, the compasses were actually in a defective condition, and the owner and master both knew it. The important facts here regarding compasses are more like those of The Oritani, D.C., 40 F.2d 522, which exonerated the owner from liability. I find that the Denali's compasses were in good mechanical condition and free from excessive deviation; that such deviation as existed was known to and

allowed for by the master and other navigating officers; and that the compasses were in good and safe navigating condition at the inception of the voyage and remained so until the stranding.

**2. Charts.** It appears from the testimony of ship's officers, Healy, Larson, Lawton, and Obert, that when the Denali sailed from Seattle on the voyage she had on board a complete set of charts for Puget Sound, British Columbia, Southeastern and Southwestern Alaska, Bering Sea, and Bristol Bay, as well as numerous other charts. Three days prior to the sailing the second and third officers checked over the ship's list of charts on board and compared the list with the latest Canadian and American chart catalogues, and under the direction of the master the second officer prepared a requisition for and received on board some additional new charts. The Denali's master for her last 1934 voyage testified that he left on board a full set of charts for Southeastern and Southwestern Alaska and British Columbia. The vessel was also supplied with sets of British Columbia Pilot, Hydrographic Office Publication 176, and United States Coast Pilot for Alaska, which publications describe or mention Caamano Passage and the reef upon which the Denali stranded. Cargo claimants contend that United States Hydrographic Office Chart, being H O 2828 (Petitioner's Exhibit 33), which is a copy of British Admiralty Chart 1737 (Petitioner's Exhibit 74) and is generally referred to as a large scale and easily usable chart, was not on board (although no positive evidence was offered in support of that contention), but the ship's navigating officers testified that H O 2828 was on board and in actual use by the officers at the time of the stranding. The latest Coast and Geodetic Survey Chart No. 8102, covering the area about the stranding, was on board and was saved from the stranding and is now in evidence as Claimant's Exhibit A-10. The ship was also supplied with Notices to Mariners, published weekly by the Hydrographic Office and showing any changes in existing charts. Capt. Healy testified that on May 18th he laid out the vessel's magnetic course from Triple Island Light through Caamano Passage on chart H O 2828, which was on the chart table with chart C & G S 8102 at the time Pilot Obert and Third Mate Lawton took over the watch at midnight May 18; that

C & G S 8102 is a proper chart for safe navigation through Caamano Passage; that it is not necessary to have chart No. 2828 to go through that passage; that you can go through that passage just as well by the use of chart No. 8102 as by the use of chart No. 2828 and that it would be safe and good practice to do that. Commander Richards of the Coast Guard cutter Cyane testified by deposition that he checked in all about 20 charts "including one or more editions of the following charts: Hydrographic Office Chart No. 1584; Hydrographic Office Chart No. 2825, and Hydrographic Office Chart No. 2828; Coast and Geodetic Survey Charts No. 7002, No. 8002, and No. 8102; and British Admiralty Charts No. 1737, No. 1923, No. 1923-A, No. 2430, and No. 3754," and "found them all to be in substantial agreement as to Denali rock (the name applied by the witness to the reef on which the vessel stranded) and the immediate vicinity." That witness further testified that all Hydrographic Office and British Admiralty charts carried the notation as to that reef that it "dries 12 feet"; that the results of soundings and bearings taken by those on his Coast Guard vessel after the stranding "were in complete agreement with the chart(s), and the soundings in no case showed less water than is shown on the chart"; and that the reef on which the Denali stranded was a well-known reef, clearly shown on all the charts, and clearly described in the pilot books for those waters. Pilot Obert stated that he used both Canadian and American charts,—that "we always compare them"; that the Denali had on board "some old charts, and brand new charts, and harbor charts as well"; that it didn't make any difference which chart was used, new or old, so far as location of the reef was concerned, as it showed on both old and new charts; that at the time of the stranding he thought the ship was past that reef. Both Pilot Obert and his assistant watch officer, Third Mate Lawton, were aware of the reef, knew it was there. Pilot Obert had seen it before while navigating Caamano Passage on previous voyages. The stranding, therefore, was not in fact caused by insufficient charts; there was no insufficiency of charts; and I find the Denali was properly equipped and supplied with charts entirely adequate for her safe and seaworthy navigation. The Oritani, D.C., 40 F.2d 522, at pages 528, 529.

3. *Division of Mates into Watches.* At the time of the stranding the law required the Board of Local Inspectors to enter in the certificate of inspection of the Denali "The minimum number of licensed deck officers required for her safe navigation according to the following scale: * * * Every such vessel * * * shall have in her service and on board three licensed mates, who shall stand in three watches while such vessel is being navigated." 46 U.S.C.A. § 223.

There was also in effect at that time a law providing that no licensed officer shall be required to do duty "more than twelve hours of any twenty-four at sea. * * * Any violation of this section shall subject the person or persons guilty thereof to a penalty of $100." 46 U.S.C.A. § 235.

■ Cargo claimants do not contend that section 235, supra, was violated, but they do contend that the owner violated section 223, supra. They also cite the Act of June 25, 1936, 46 U.S.C.A. § 673, providing that no licensed officer shall be required to work more than 8 hours in one day; but this act does not apply in this case because it was passed after the stranding and did not take effect until 6 months after its enactment.

■ Sections 223 and 235 of 46 U.S.C.A., above referred to, are respectively sections 2 and 3 of one and the same original act of Congress, namely, the Act of May 11, 1918. It is clear from reading the whole of that original act that Congress intended by the provisions of section 2 to obligate primarily if not exclusively the Board of Local Inspectors with reference to the performance of their duties regarding their proper certification of crew lists. There is no provision in that section expressly placing any duty upon the shipowner or any one else other than the board, nor imposing any penalty upon any one at all for violation of any of its provisions. Specifically, that section does not expressly command the shipowner to require the three licensed mates to stand in three watches. So far as its express language goes and bearing in mind that the section relates to navigation or management of vessels, it may be that Congress by that section intended to leave it to be inferred that the master who actually attends to the navigation and management of his vessel would divide his three mates into three watches without an express command from Congress that he do so, and that for that reason the master was not so commanded. It could not, of course, be fairly reasoned that, because Congress did not expressly obligate either the owner or the master, it was nevertheless intended that the owner personally should be bound to see that the section 2 scale for division of the mates' watches is applied letter perfect. Section 3 of the Act of May 11, 1918, 46 U.S.C.A. § 235, however, does expressly relate to the shipowner, among others, because it begins with the provision: "It shall be unlawful for the master, owner, agent, or other person having authority to permit an officer of any vessel" to do certain things, and then provides: "No licensed officer * * * shall be required to do duty * * * more than twelve hours of any twenty-four at sea." Section 3 further provides an express penalty for noncompliance and imposes that penalty upon any one guilty of a violation of that section.

Since the acts required to be done by section 2 are expressly required of the Board of Local Inspectors and no one else, and the acts prohibited by section 3 are the acts of the shipowner, among others, it seems clear that Congress intended to obligate only the board with reference to the duties imposed by section 2, and that cargo claimants are in error in their contention that the owner here is bound by the statutory duty imposed by section 2 to see that the mates were divided into watches.

■ If, however, cargo claimants are right in their contention that section 2 does apply to the owner here, it is to be noted that the Board of Local Inspectors at Seattle did determine and certify the minimum number of licensed deck officers for the Denali to be one master and three mates, and that the vessel at the time of the stranding actually carried one master, three mates and also Pilot Obert (not required), an additional officer licensed as master and pilot, who signed on as pilot and was a member of the ship's crew. Pilot Obert was in fact used as a pilot and as an additional watch officer. In the Alaska trade the chief mate does not stand a regular watch at sea but does on occasion relieve the other watch officers. Capt. Healy, the master, and Capt. Obert, the pilot, each did on the Denali stand alternate watches of 6 hours on and 6 hours off, it being the practice (which was fol-

lowed in this case) to substitute the master or pilot as watch officer in the place of the chief mate; so that at all times during a 24-hour day there was on watch in place of the chief mate either the master (having also a pilot's license) or the pilot who in the performance of their duties not only took the place of the chief mate as watch officer, but also performed the duties of pilot. The second and third mates on the Denali stood 8-hour watches.

Cargo claimants contend that since only two of the mates (the second and third) actually stood their watches and because the chief mate was not given a regular watch while the vessel was being navigated, the statute, section 2, Act of May 11, 1918, 46 U.S.C.A. § 223, relating to the division of the mates into watches, was violated, notwithstanding the fact that the watch which the chief mate might have been required to stand was actually stood by the master and pilot. That substitution of the master and pilot as watch officers for the chief mate may not be said to be a literal compliance with the statutory scale, compliance with which the Board of Local Inspectors are required to enter in their certificate of inspection, but the duties of a watch officer cannot be said to be less competently performed by the master or pilot than by the chief mate, in view of the fact that both the master and pilot are expected to be and in this instance were specially skilled as navigators and pilots for the particular waters where the stranding occurred. There is no proof or intimation that the chief mate was better qualified than either the master or the pilot. By reason of their experience and licenses, both the master and the pilot were supposed to be and undoubtedly were better qualified as watch officers than the chief mate.

The watch officers on duty at the time of the stranding (Pilot Obert and Third Officer Lawton) both knew that the reef was there; had some time before the stranding actually seen Zayas and Dundas Islands; knew that the vessel was entering or had already entered Caamano Passage; Pilot Obert thought that the vessel had already passed the reef; and both the pilot and the third officer thought that the vessel was by currents being set westerly off her course, and at the time of and for some time before the stranding the pilot was maneuvering the vessel by piloting or "conning the ship" instead of steering solely by compass in order to overcome that westerly set and to bring the vessel back on her intended course through Caamano Passage. There is neither evidence nor reasonable inference from evidence that any person connected with the navigation of the ship was either fatigued from excessive labor or lacking in sufficient sleep or rest at the time of the stranding or at any time during the voyage.

■ And so from the foregoing it obviously appears that, even if it can be successfully contended that the section 2 scale for division of watches obligates shipowners and that the owner has in this instance violated that section (a contention with which this court does not agree), the evidence here is clear and convincing that the stranding was not in fact and could not have been caused or contributed to by duration or improper division of the mates' watches, and I so find. In that situation the owner has fully performed the strict requirement of the law relating to the amount or degree of proof as announced by the Circuit Court of Appeals for the Ninth Circuit in The Silver Palm, The Chicago, 94 F.2d 754, 1937 A.M.C. 1427, at page 1436, and by the Supreme Court in Lie v. San Francisco, etc., S. S. Co., 243 U.S. 291, at page 298, 37 S.Ct. 270, 61 L.Ed. 726.

The Denali was, therefore, seaworthy in respect to the manning of the vessel and the division of her mates and officers into watches.

Cargo claimants make a general charge of untruthfulness of testimony, and also charge that certain witnesses were successfully impeached. These charges are not justified. In some instances there were discrepancies or seeming partisanship on the part of some witnesses (all of whom, however, did not appear on the same side), but in those instances the discrepant or partisan testimony was largely cumulative or corroborative of other credible testimony in the case and was not indispensable to the issue involved. In other important instances counsel failed in efforts to impeach. No witness appeared to deliberately or knowingly falsify. The trial was a long one consuming about 32 trial days; many witnesses were called and testified; the transcript of the trial record comprises about 4,500 typewritten pages; but on the whole I have never seen more honest, frank, or candid witnesses than those at this trial.

### Cause of Stranding—Conclusion as to Liability.

The navigating officers expected and allowed for some current which would affect the ability of the ship to make good her intended course through Caamano Passage, but the compelling inference from the positive testimony of Pilot Obert and Third Mate Lawton, unchallenged by any evidence to the contrary based on personal knowledge of the fact, is that currents of unusual force and effect, much greater than any allowed for when the intended course was set, began an appreciable time before the stranding to set against and drive the vessel westerly off her intended course, so that when she stranded her position was at least 4 degrees west of her intended course; that the full extremity of that current force was not predictable, but that Pilot Obert, by reason of his many years experience as a navigator in those waters, knew or should have known of the vessel's increasing danger long enough before the time of the stranding to have taken proper precaution against it. This he did not do. Although he said he put the vessel's heading to starboard several times, he observed a considerable time before the stranding that these measures were not effectually placing the vessel back on her course. After realizing his danger from the unusual currents and knowing as he did that the reef was there, he still had time to rescue the vessel from the peril of the reef by reversing her engines, checking her speed, and completely stopping her movement a safe distance from the reef, or he could have avoided the reef by even more sharply turning her direction to starboard—to the eastward.

The most outstanding circumstance and proof in the whole case is the fact that Pilot Obert never at any time charged fault or insufficiency in the compasses, charts, or division of watches. He had more at stake than any other member of the crew. He had a record of 40 years of honorable and efficient service at sea, for about 30 years of which he was a navigating officer in Alaska waters; and at the hearing before the Steamboat Inspectors he faced the possibility of losing his license. Not even the natural inclination which one ordinarily has to first save himself was enough to weaken the positiveness of his self-effacing statement (corroborated by the master and third mate) that it was currents, not compass deviation, which were setting the vessel off course. He undoubtedly understood the significance of that statement. By it he in effect shouldered personal responsibility for extricating his ship from a known peril by his careful and safe navigation. Also by that statement and its attending circumstances we are given another forceful example of the high honor and integrity of the men who "go down to the sea in ships." These considerations should lay at rest any possible doubt of the truth of the pilot's statement as to the cause of the ship's westerly offset and consequent stranding.

I therefore find and decide that the stranding of the Denali and the resulting total loss of the vessel and her cargo were due solely to fault in her navigation; that at the commencement of the voyage at Seattle and during the remainder thereof until the time of stranding, the vessel was in all respects seaworthy and properly manned, equipped, and supplied; that her owner is entitled to exemption and exoneration from all liability for the loss of cargo, as provided by section 3 of the Harter Act, 46 U.S.C.A. § 192; and that the claims of cargo claimants must be dismissed.

Findings of fact, conclusions of law, and decree may be settled upon notice or stipulation.