## THE TEMPLE BAR.

### Petition of TEMPLE S. S. CO. Ltd.
### No. 2426.

District Court, D. Maryland.
June 29, 1942.

Ritchie, Janney, Ober & Williams, of Baltimore, Md., and Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert W. Williams, of Baltimore, Md., L. de Grove Potter and Eugene F. Gilligan, both of New York City, and Southgate L. Morrison, of Baltimore, Md., of counsel), for petitioner Temple S. S. Co., Ltd.

Lord & Whip, of Baltimore, Md., and Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and James Ryan, both of New York City, and George W. P. Whip, of Baltimore, Md., of counsel), for claimant Continental Ins. Co.

COLEMAN, District Judge.

This is a proceeding for exemption from liability combined with a proceeding for limitation of liability, brought pursuant to the provisions of 46 U.S.C.A. §§ 183–188, by the Temple Steamship Company, Ltd., a British company, owner of the British steamship Temple Bar. The owner was originally sued in this Court by the Continental Insurance Company, the insurer of a cargo of approximately 7,000 tons of scrap iron shipped by Japanese charterers on this vessel which was lost when the vessel stranded on the coast of the State of Washington on April 8, 1939. The insurance company paid the Japanese owners of the cargo for its loss prior to the outbreak of the War, took an assignment of such owners' rights against the vessel, and has filed its claim for $157,990. By injunction of this Court, issued on July 18, 1940, further proceedings in this original suit were stayed pending a determination of the issue in the present and later proceeding, which involves the determina-

tion of two questions: First, whether the insurance company, the sole claimant in the limitation proceedings, has any valid claim against the owner of the vessel; and second, if it has, whether the owner is entitled to limit its liability to the value of its interest in the vessel and her pending freight. Obviously, if the first question be answered in the negative, there is no need for consideration of the second question.

The Temple Bar was a steel screw steamship of 4,291 gross, and 2,570 net, tons register, 390 feet in length, 52 feet beam, 27.2 feet moulded depth, and was built in 1928. For her ill-fated voyage she loaded her cargo at Jacksonville and Fort Everglades, Florida, leaving the latter port on March 14, 1939, whence she proceeded to Jamaica for coal, thence through the Panama Canal and was on her way up the Pacific Coast to Comax, British Columbia, for further coaling when the stranding occurred in the early morning of April 8th. At 8:20 p.m. on April 6th, she was in a position about nine miles off Cape Blanco on a course N 46° W. Her course was then changed to N 26° W, and again shortly afterwards to N 27° W. She proceeded until 8:00 a.m. on April 7th on the latter course when it was changed to N 23° W, and at noon of the same day was again changed to N 19° W. This latter course was maintained until the Temple Bar stranded at 3:30 a.m. on April 8th on Quillahute Needles Rock, south of James Island light and near the mouth of the Quillahute River, Washington, and north of Destruction Island light. The place of stranding was to the east and south of the calculated position of the master of the Temple Bar. The N 19° W course had been set at noon on April 7th to pass Destruction Island light on the starboard beam, at a distance of 18½ miles and to pass Yumatilla light vessel on the starboard beam at a distance of three miles. The Temple Bar's master and second officer testified that they had expected to sight Destruction Island light at 2:30 a.m. on April 8th, but that a misty rain came on and they passed Destruction Island light without seeing it. The second officer was on watch with the helmsman and bow lookout at the time of stranding. The weather was unfit for stellar observations on the evening of April 7th and the only log saved from the vessel, at least the only one that has been placed in evidence and said to be available, namely, her scrap-log, shows that the weather was overcast at 11:00 p.m. on that evening, with a light following (southerly) wind. The master left the bridge at 11:30 p.m. on that evening to go to bed, giving instructions in his night orderbook "to check position when possible" and that he should be called when the vessel was abreast of Destruction Island light. At 2:00 a.m. the second officer awakened the master because concerned over not having picked up this light, but the master expressed no alarm, believing that the vessel had not run far enough to do so, and accordingly the vessel was held upon her same course until she stranded as already explained, and sank within a few minutes, her officers and crew escaping in the life boats. Salvage of the vessel was impossible, and she was sold, less certain equipment that was removed, for less than $2,000 where she lay.

■ The charter party is dated February 16th, 1939, and provides for the carriage of one entire cargo for a single shipper. It was not executed in London by the British Company, the owner of the vessel, but in New York City by the Freighting Corporation of America, as brokers for the owner. Therefore, on the authority of the distinction between personal and nonpersonal contracts as defined in Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 421, 53 S.Ct. 200, 77 L.Ed. 403, this charter party is not to be treated as a personal contract, and so the owner is not denied the right to invoke the limitation of liability statute. See, also, Hockley v. Eastern Transportation Co., D.C., 10 F. Supp. 908.

■ The Harter Act, 46 U.S.C.A. §§ 190–195, is incorporated by express reference in the bills of lading for so much of the cargo as was taken on at Jacksonville, and both this Act and the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315, are expressly incorporated in the bills of lading issued for the rest of the cargo taken on at Fort Everglades. But we need not dwell upon any of these documents since it is well settled that as between the provisions of a charter party and of a bill of lading, the former control. The G. R. Crowe, 2 Cir., 294 F. 506, certiorari denied 264 U.S. 586, 44 S.Ct. 335, 68 L.Ed. 862; The Nordhvalen, D.C., 6 F.2d 883. We, therefore, turn to a consideration of the provisions in the charter party which purport to define the liability of the vessel and its owner. These are to be

found in paragraphs 2 and 30 of the charter party. The first section of paragraph 2 reads as follows: "It is also mutually agreed that the Carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the perils of the seas or other waters, by fire from any cause or wheresoever occurring, by barratry of the Master or crew, by enemies, pirates or robbers, by arrest and restraint of Princes, Rulers or People, by explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery or appurtenances, by collisions, stranding or other accidents or navigation of whatsoever kind (even when occasioned by negligence, default or error in judgment of the pilot, Master, mariners or other servants of the Ship Owner, not resulting however, in any case from want of due diligence by the Owners of the Ship or any of them or by the Ship's Husband or Manager). Charterers also not to be responsible for restraint of Princes, Rulers or People." After providing for General Average, paragraph 2 concludes by incorporating into the charter party the Harter Act, 46 U.S. C.A. §§ 190–195, by providing that "It is also mutually agreed that this Contract is subject to all the terms and provisions of, and all the exemptions from liability contained in, the Act of Congress of the United States, approved on the 13th day of February, 1893, and entitled 'An act relating to navigation of vessels,' etc."

Paragraph 30 of the charter party, in addition to providing for the incorporation of statutory or other provisions with which we are not concerned in the present suit, provides that the "Paramount" clause is "to be incorporated in this charter party." By the weight of the credible evidence introduced in the present case, this reference to the "Paramount" clause is to be taken in the sense in which that phrase is generally understood in the shipping trade, namely, that it has reference to the following clause: "This charter shall have the effect subject to the provisions of The Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this charter be repugnant to said Act to any extent, such term shall be void to that extent but no

further." See The Steel Inventor, D.C., 35 F.Supp. 986.

Thus, the Carriage of Goods by Sea Act which became effective July 15th, 1936, 46 U.S.C.A. §§ 1301–1315, is expressly incorporated in the charter party, and by its very terms, § 12, 46 U.S.C.A. § 1311, supersedes the earlier, Harter Act when, as here, we are concerned not with rights and liabilities in relation to a cargo before its loading or after its discharge from the vessel, but during the voyage. The Carriage of Goods by Sea Act contains the following provisions, § 4. (1, 2), 46 U.S.C.A. § 1304 (1) and (2), which are very similar to Paragraph 2 of the charter party already quoted: "(1) Unseaworthiness. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, * * *. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2) Uncontrollable causes of loss. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

\* \* \* \* \*

"(c) Perils, dangers, and accidents of the sea or other navigable waters;

"(d) Act of God;

"(e) Act of war;

"(f) Act of public enemies;

"(g) Arrest or restraint of princes, rulers, or people, or seizure under legal process;

\* \* \* \* \*

"(p) Latent defects not discoverable by due diligence; and

"(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

Both the Harter Act and the 1936 Act have the same underlying purpose. "Both prohibit the operation of contractual limitations upon the carriers' liabilities in handling goods, while at the same time granting them, in return, immunities from liability. In each the scheme is first to take away something, and then in return to give something which puts the liabilities on a single and statutory standard, rather than leaving them to the contractual divergencies, and the judicial divergencies in interpreting the contractual divergencies, which had previously obtained." Robinson on Admiralty, § 70, page 497. By the Harter Act such immunities as are granted are expressly made to depend upon the exercise of due diligence to make the vessel in all respects seaworthy, so that if there is a lack of such diligence the vessel owner is liable notwithstanding the fact that there may be no causal connection between the damage and the lack of diligence. By the 1936 Act, the vessel owner, while required to exercise due diligence in furnishing a seaworthy vessel, incurs no liability for loss arising even from unseaworthiness unless such is caused by lack of due diligence to make the vessel seaworthy. In short, the later Act, unlike the earlier one, does not condition its exemptions upon due diligence to make the vessel seaworthy, but only liability for loss due to unseaworthiness is so conditioned.

■ The 1936 Act expressly relates to foreign trade, that is, to the transportation of goods between ports of the United States and ports of foreign countries. However, provision is made for adoption of the Act by express agreement in cases of domestic trade. § 13, 46 U.S.C.A. § 1312. The 1936 Act is not made applicable to charter parties but its provisions may be incorporated by reference as has been done in this case. § 5, 46 U.S.C.A. § 1305. See Mente & Co. v. Isthmian S. S. Co., D.C., 36 F.Supp. 278; Id., 2 Cir., 122 F.2d 266. Section 3 of the Act, 46 U.S.C.A. § 1303, in defining seaworthiness, provides as follows: (1) "The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

"(a) Make the ship seaworthy;

"(b) Properly man, equip, and supply the ship; * * *." Then, as already pointed out, Section 4 of the Act provides that there shall not be liability for loss or damage arising from unseaworthiness unless caused by want of due diligence to make the ship seaworthy, properly man, equip, etc., Section 4 repeating in effect, the language of Section 3 and providing, as we have seen that "Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section." Thus "The carrier may immunize himself, by diligence, from losses due to unseaworthiness. The new Act thus reaches the result which was argued for in The Carib Prince [170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181] and by the Supreme Court there rejected." Robinson on Admiralty, Section 71, pages 512, 513.

■ Therefore, to summarize, the following principles seem clear from the language of the Act: (1) The shipowner has the burden of proving that the vessel was seaworthy when she sailed, or that he had exercised due diligence to make her so; but (2) even if the shipowner fails in this proof, the claimant still cannot recover unless he sustains the burden of proving that the unseaworthiness did, in fact, cause the loss or damage in question.

■ It is contended on behalf of the claimant here that by incorporating in the charter party the provisions of the 1936 Act, the vessel owner thereby converted the contract of carriage from that of a private to a common carrier who had, in effect, assumed the obligation of an insurer. However, we find no support for this theory in the decisions or otherwise any merit in it. Given the status of a private carrier, such as unquestionably was the status of the owner of the Temple Bar in the present instance, it is not incompatible with such status for the vessel owner, if he sees fit to do so, to contract that his liability as a private carrier may be different from what the law would otherwise impose upon him. This is all that the present shipowner has done by agreeing to make himself subject to the provisions of the 1936 Act. See Mente & Co. v. Isthmian S. S. Co., supra; The Agwimoon, D.C., 24 F.2d 864; affirmed Atlantic Gulf & West Indies S. S. Lines v. Interocean Oil Co., 4 Cir., 31 F.2d 1006. In this connection see the quite recent opinion of the Supreme Court in Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. ——, which, however, does not involve either the Harter Act or the 1936 Act.

614

Adapting, then, the aforegoing principles to the present case, we turn to a consideration of the facts as disclosed by the evidence.

The cargo owner makes five charges of unseaworthiness against the vessel: (1) That the compasses were not adjusted/ by shore adjusters at the loading point as they should have been because of the character of the cargo; (2) that the steering compass was totally or substantially dry during the entire voyage; (3) that the vessel's sounding machine lacked wire during the voyage; (4) that the vessel's charts were improper in that they were (a) too small as to scale; (b) insufficient as to depth data; (c) failed to show James Island light; (d) incorrect as to variation figures; and (5) that the vessel's Coast Pilot was inadequate.

■ Taking up the evidence as bearing upon these charges in the order named, and therefore considering first the compasses, I find that unseaworthiness cannot be predicated upon failure to have had them adjusted by shore adjusters at the loading point, for two reasons: (1) There is no proof of the existence of a custom or practice at any ports in this country, of vessels having such adjustments made merely because of this, or any other type of cargo, independently of need for such adjustment being indicated; (2) there is no proof that either the standard or the steering compass was affected by any magnetism from the cargo, or from use of magnetic cranes for loading the scrap iron. As is customary, the compasses were kept ashore while the loading was being done, and the vessel's scrap-log indicates that there was no more deviation, i. e., the difference in degrees between the direction of the magnetic pole and the compass needle, caused by the ship, her cargo, etc., after the cargo was loaded, than before.

■ As to the second contention, namely, that the steering compass was totally or substantially dry during the entire voyage, little time need be devoted to this contention because, first, there is no convincing proof that the compass exhibited in the course of the trial was, in fact, the steering compass actually used on the Temple Bar during this particular voyage. Even counsel for the claimant do not affirmatively so contend. Also, this exhibited compass has changed hands many times and there is no proof as to what its condition was when taken from the vessel, assuming that it was on the vessel at the time of

the stranding. When exhibited in Court it was filled with proper liquid. Second, it is entirely unreasonable to suppose that if at any time in the course of the voyage, the Temple Bar's steering compass was totally or substantially dry, the vessel could have been steered with any degree of precision. That is to say, it is common knowledge that a compass in such condition would "run wild" and therefore it is not reasonable to assume that any licensed navigator, upon finding that a compass acted in this way, would not have had it corrected forthwith.

■ As to the vessel's sounding machine, the testimony is as follows: The shipowner's Superintendent Engineer stated that when the Temple Bar left England in January, 1939, she had full standard equipment in this respect, namely, that she was equipped with a Whyte-Thompson patented sounding-machine capable of taking soundings at any speed; and that she also had two hand lead lines, one a deep sea lead and one for shallow work. The sounding-machine consisted of a steel wire on a hand-driven winch, with a lead sinker and sheath containing the compass and tube for depth recording. The master testified to the same effect and also that this equipment had been overhauled regularly, and that, to the best of his knowledge, it was in the same condition at the time of stranding as when the vessel left Port Everglades.

The fact that the only one of the vessel's logs, namely, the scrap-log, that was salvaged, does not show that this sounding machine had been used on this voyage prior to January 4, 1939, does not appear to justify the inference that it was not in good working order prior to the stranding, any more than does the fact that no order was given to use it on the night of the stranding. The vessel's radio beacon finding apparatus was not resorted to as a position finder on that evening, yet that apparatus was admittedly in good working order at the time.

The absence of any wire on the spool of the sounding apparatus when the vessel was boarded after the stranding, and the fact that the spool was rusty, form the basis of the main argument for the cargo claimant that this equipment was not in good working order at the time of the stranding, namely,—that no wire was in fact available for soundings. Special reliance is placed by the claimant upon the testimony of Chief Boatswain Reutercrona, and others, of the local Coast Guard Station, which

is to this effect. However, it is uncontradicted that representatives of the Coast Guard did not board the vessel until more than 24 hours following her stranding, and that they did not go on the stern of the vessel where the sounding machine was located until a week after their first visit. These facts, coupled with the fact that, as we find from the weight of the credible evidence, Indians living along this part of the Washington coast were seen to go to and from the vessel frequently in their canoes, and to carry off a great deal of her equipment from time to time; and that representatives of the United States Customs Service who went aboard in company with the Coast Guard men, and two salvors, took off a great deal more, overcome, we think, such presumption as might arise that complete sounding equipment was not on the vessel and in good working order at the time of the stranding. Both whites and Indians who could get aboard the vessel before she began to break up seem to have helped themselves pretty much to whatever they wanted, that was removable. No effective patrol was ever established around the vessel by the Coast Guard, who admit that coils of wire, never accurately identified, were taken off.

 Coming next to the claim that the vessel's charts were improper, we will consider the first ground for this contention, namely, that the only chart for this part of the Pacific coast which was on board the vessel was a British chart, issued in 1920 and corrected only to 1928, and of too small a scale. However, this chart was on the largest scale of coast charts published and made available by the British Admiralty for the coast of Washington at the point of stranding at the time the Temple Bar began her voyage. A British vessel navigating American waters cannot be held to be unseaworthy for mere failure to have on board an American chart, or the latest edition of a British chart, provided what she does have available is complete as to all lights, signals, buoys and other aids to navigation. Although a small scale chart and not as complete in all respects as the latest United States chart, we find from the weight of the credible evidence it was entirely adequate for safe navigation, and contained in this respect all the aids to navigation which the later British and American charts contained. The Master of the Darlington Court, another British vessel which safely passed by, only a few hours before, the

point where the Temple Bar stranded, carried only British charts. We find in the authorities no such requirement as to charts as that for which claimant contends. See The Tregenna, 2 Cir., 121 F.2d 940; The Maria, 4 Cir., 91 F.2d 819; United States Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752; The Oritani, D.C., 40 F.2d 522, affirmed 3 Cir., 54 F.2d 1075.

 Next, as to the claim that this chart had insufficient depth data, by comparing it with later British charts it appears that it had identical contour lines showing one hundred fathom and fifty fathom depths along the coast in the general vicinity of the place where the stranding occurred. Thus, any soundings showing less than one hundred fathoms would immediately locate the vessel inside the one hundred fathom contour; and any sounding showing less than fifty fathoms would likewise locate the vessel inside the fifty fathom contour. Since, however, no soundings were, in fact, made on the night of the stranding, the absence of sounding figures on this chart did not and could not have contributed to the stranding in any way.

 As to the claim that the chart was inadequate in that it failed to show James Island light, suffice it to point out that there is no evidence contradicting that of Captain Bain, a Lieutenant Commander in the United States Navy, on inactive list, and at the present time Assistant Superintendent of the Hawaiian-American Steamship Company, and of Captain McQueen of the Donaldson Line, testifying on behalf of the vessel owners, that this small light was of relatively small candlepower and was never relied upon for coastal navigation. Its position and candlepower indicate that it was established for small craft entering the shallow Quillahute River. Furthermore, it is significant that this light likewise does not appear on the later and revised British Admiralty chart with which the cargo claimant says the vessel should have been equipped. It does, however, appear in the List of Lights and Tides of the World which was found on the Temple Bar after the stranding.

 Lastly, we turn to the contention that the chart contained incorrect variation figures, that is to say, that it contained misinformation as to variation on the chart's compass roses. The compass rose on the chart nearest in line with the

Temple Bar's April 7th noon position, when calculations for variation according to that rose are made down to the year 1939, shows variation 23° 47″ E. By the later Admiralty chart, the variation for the same position computed for 1939 would be 22° 5″ E. The claim therefore is made that the master of the Temple Bar, being thus misinformed by the chart as to what was the actual variation, used the incorrect figure in laying his April 7th course. However, the log states the noon variation on April 7th to be 22° 45″ E and not 23° 47″ E as computed by the old chart. Therefore, the misinformation as to variation on the old chart cannot be said to have misled the master, because it does not appear that he used or recorded in his log the variation figure that accorded with that chart. Furthermore, even assuming that he had used it, it is clear from the testimony that the greater the total easterly compass error, the more westerly would be the compass course necessary to compensate for such error. That is to say, even if the master had relied on the variation figure of his chart, since it was a greater easterly variation than appears from the later charts, he then would have steered to that extent a more westerly course than was necessary, and would not have been taken further inshore, but further offshore.

▆▆▆ Finally, as to the claim that the vessel's British "Coast Pilot" was inadequate, suffice it to say that this volume contained all of the information to be found in the later edition of it, and substantially the same information contained in the corresponding United States "Coast Pilot." So there can be no ground for saying that the older edition was inadequate.

We thus reach the conclusion that there is a complete failure of proof that the vessel was unseaworthy in any of the foregoing respects, or that if she was, her owner had failed to use due diligence to make her so, when she sailed from the Florida east coast, or that unseaworthiness had any causal connection with the stranding. We are not unmindful of the fact that Captain Moloney, of Seattle, a marine surveyor, testifying for the cargo claimant, stated that he thought the Temple Bar was unseaworthy as respects the first four of the grounds just analyzed. However, and taking into full account the fact that Captain Moloney had had long experience in west coast navigation, although recently he had not been in command of any large

vessels, we do not think that his testimony is nearly as convincing as the testimony given by Captains Bain and McQueen on behalf of the vessel owner, who had made many trips up and down this west coast. Epitomizing their testimony as to what they both believed to have been the cause of the disaster, it gives a clear and completely convincing picture of extreme negligence on the part of the master in navigating the Temple Bar who, it is to be noted, had never previously navigated these waters. That is to say, while he had laid down a proper course, he did not check his positions between noon on April 7th and the time of stranding as he should have done by radio cross bearings or soundings, or both; namely, he failed to account properly for an inshore set; and although he had allowed 5° W for such a set the night before, he failed to make any allowance of this kind on the night of the stranding, presumably, because not having found that a set had materialized on the previous night, he considered such an allowance not necessary the next night.

Only about five hours prior to the Temple Bar's stranding another British freighter of comparable size, the Darlington Court, to which reference has previously been made, passed the location, going in the same direction on a course N 11° W (T). Her master testified that he had only British charts; that he established his position from time to time by radio cross bearings; that in the afternoon and evening of April 7th he had twice altered his course due to a strong easterly set which varied in speed from one-half to two miles an hour; that he had made numerous trips along this coast, the navigation of which required extra care; that, therefore, it was his custom to be on the bridge or in close touch with the navigation of his vessel throughout a voyage along this coast; that he had never, in fact, previously encountered as strong an easterly set as that which he experienced on April 7th; and that while on this particular evening the weather was not such as to necessitate taking soundings, on other occasions when navigating this coast in thick weather, he had frequently resorted to the taking of soundings in order to check his vessel's position, and that in both thick and clear weather he had frequently made use of radio cross bearings for the same purpose.

While the Temple Bar was not equipped with the latest edition of the British Ad-

miralty Sailing Directions entitled "West Coast of Central America and United States", there was on board the 1935 edition of this publication which contained all of the information to be found in the later edition. Furthermore, we find no merit in the contention that the vessel's equipment was deficient in that there was not aboard the vessel a copy of the United States Coast Pilot for the Pacific Coast, since the information contained in the corresponding publication of the British Admiralty just referred to is substantially the same. For example, we find the following taken from the British Admiralty Sailing Directions (page 33) to be duplicated, substantially verbatim, in the American publication: "Navigation along the Pacific coast of the United States is required to be carried out with all due caution, as the courses between salient points are, in general, long, and must be traversed during frequent periods of thick weather with the vessel subject to the action of currents (page 23), the rate and direction of which are uncertain." Also "From a study of the investigations made into the causes of strandings on this coast, it was found, however, that a large percentage of the strandings were due to the lack of the ordinary precautions essential to safe navigation having been taken, e. g., soundings, knowledge of compass deviation, etc."

It is true that the Carriage of Goods by Sea Act does not reduce the standards, imposed previous to that legislation, by which the seaworthiness of a vessel is to be tested, nor the requirements which constitute the exercise of due diligence. It must also be conceded that if the facts in any case disclose unseaworthiness resulting from the vessel owner's failure to exercise due diligence to make the vessel seaworthy, which concur with negligent navigation in causing the loss, the owner will be liable. That is to say, unseaworthiness cannot be transformed into bad seamanship for the purpose of avoiding responsibility for loss of vessel or cargo. If more than one means is required to effect seaworthiness, the lack of any one of them cannot be excused. The Maria, 4 Cir., 91 F.2d 819; Leathem Smith-Putnam Navigation Co. v. National Union Fire Insurance Co., 7 Cir., 96 F.2d 923.

In the present case the Court has been very definitely handicapped in its ability to form conclusions as to the credibility of many of the most important wit-

nesses because, due to their foreign residence and war conditions, they,—that is to say, the master and other officers and crew of the Temple Bar—testified more than two years after the stranding and by deposition only. Thus, the Court never had an opportunity to see and to hear these witnesses and to form a first-hand impression as to their veracity or accuracy of statement. On the other hand, the Court has had the benefit of seeing and hearing other witnesses, notably Captain Bain and Captain McQueen, whose credibility has not been impeached in the slightest and whose long experience in the navigation of the Pacific coast must, we feel, be given all due weight. When this is done, and when due weight is given to the rest of the credible evidence, the conclusion seems inescapable that this is not a case of an attempt to transform unseaworthiness into bad seamanship for the purpose of avoiding responsibility.

We find no support in the testimony for the theory that the master of the Temple Bar had removed from the vessel and concealed her other important official records, such as the smooth log, the compass deviation card, etc. In short, we conclude that the weight of the credible evidence indicates that the stranding of the Temple Bar was caused by faulty navigation of the very type which has, in fact, been virtually a concessum on the part of the vessel owner from the start, namely, that there was negligent failure of a very grave sort to check the vessel's position during the night of the stranding, by radio cross bearings or by soundings, or both, and we do no find that this negligence was in any respect caused by any unseaworthiness of the vessel. Captain Tucker, the Temple Bar's master, had held this position only since the previous year. He had never navigated our Pacific coast prior to this voyage. A short while before, while in command of the Temple Bar, she had grounded in Fehmar Sound, at the entrance to Kiel Bay, in a storm. However, it should be said, in fairness to the master, that the present record does not disclose facts from which it can reasonably be assumed that the master was responsible for this earlier misfortune. He gave as his explanation of the stranding with which we are concerned "an abnormally strong easterly set of current." But he is not to be exonerated from the results that followed when he failed to check his vessel's position by the use of the normal means which he admits he had at hand, and

618

which the prudent navigator would have used under such circumstances.

It thus becomes unnecessary to consider any of the other questions that have been raised, and a decree will be signed in accordance with this opinion, dismissing the claim.