Anthony **LEVATINO**, Stephen Levatino
and Joseph Levatino, d/b/a Levatino
Company, Plaintiffs,

v.

**GENERAL STEAM NAVIGATION CO.,
LTD., OF GREECE** and Greek Line and
Trans-Atlantic Shipping Corporation,
Defendants.

United States District Court
S. D. New York.

Jan. 30, 1959.

Bernstein, Weiss, Tomson, Hammer &
Parter, New York City, for plaintiff.
Michael C. Bernstein, New York City, of
counsel.

Hill, Betts & Nash, New York City,
for defendants. James E. Freehill and
Francis P. Kelly, New York City, of
counsel.

HERLANDS, District Judge.

This is an action by a firm of chest-
nut importers against the owners of the
Olympia.[1] Plaintiffs seek to recoup from
defendant the damages that plaintiffs say
they suffered when the wholesale market
price of imported chestnuts dropped 40
per cent shortly after October 6, 1955.

The springboard for plaintiff's claim is
the undisputed fact that all of plaintiffs'

---

1. At the conclusion of the trial, plaintiffs
withdrew the complaint as against The
General Steam Navigation Co. Ltd. of
Greece and Greek Line.

2,020 cases of chestnuts were not unloaded from the Olympia on October 5, 1955, the same day that the Olympia arrived in New York.

On Wednesday, October 5th, the Olympia, arriving on schedule, docked at North River Pier 88 at 8:07 a. m. and commenced discharging cargo at 9:00 a. m. For the next ten hours, until 7:00 p. m., the Olympia was engaged without interruption in discharging cargo, which consisted of general cargo, tomatoes, and chestnuts. There were 5,000 cases of chestnuts aboard, constituting eighteen different lots, consigned to seven New York importers, including the plaintiffs. The plaintiffs had four lots totaling 2,020 cases.

At 7:00 p. m. the Olympia stopped discharging cargo in order to go into drydock. It left Pier 88 "without engines" (without power) and was tugboated to the Bethlehem Yards for dry-docking examination and repairs.

By the time the Olympia left Pier 88 it had discharged a considerable portion of its cargo, including 775 cases out of plaintiffs' total of 2,020 cases, as well as chestnuts for other consignees. There is no suggestion that the defendant followed an improper sequence of unloading or that defendant discriminated in its unloading orders.

The Olympia returned to Pier 88 on Friday, October 7th, and at 7:15 a. m. resumed discharging cargo, including plaintiffs' balance of 1,245 cases.

Plaintiffs charge that it was defendant's culpable fault and negligent delay in failing to discharge all of plaintiffs' chestnuts before the Olympia went into drydock on the night of October 5th that prevented plaintiffs from carrying out their intention to sell their chestnuts at the public auction held on Thursday, October 6th, which would have been before the sharp break in the market price.

Plaintiffs assert that it is settled custom in the Port of New York for steamships carrying chestnuts to work overtime and even "around the clock" if necessary, in order to discharge a cargo of chestnuts. This alleged maritime custom, the plaintiffs say, is an outgrowth of the mercantile practice of selling chestnuts at public auction on Tuesdays and Thursdays.

This public auction operation involves the following features: when cargo is landed it must be inspected by United States Plant Quarantine inspectors and cleared through Customs. Samples, consisting of five cases for each shipment and each grade of nuts, must be taken and brought to another pier where the auction will be held commencing at about 3:00 a. m. on Tuesdays and Thursdays. A printed catalog of all items to be auctioned is prepared by the auctioneers. Sellers must submit such information as amounts and quality to the auctioneers by 5:00 p. m. on the day before the sale, which in this case would have been 5:00 p. m. on Wednesday, October 5th.

There is grave doubt whether the plaintiffs actually intended to sell the chestnuts at a public auction to be held on October 6, 1955. The conduct of the plaintiffs and their dock representatives is, in the Court's opinion, inconsistent with such intention. The plaintiffs and their representatives did not make reasonably appropriate inquiries of available and informed pier and ship personnel, such as the ship foreman, the dock boss and the pier superintendent. The plaintiffs left the pier prematurely while cargo was being discharged. They made no arrangements for Plant Quarantine inspectors' examination and sampling of the cases still to be discharged.

The Court does not accept the testimony offered in behalf of the plaintiffs that they or their representatives were told at about 3:00 or 3:30 p. m. by the delivery clerk or the dock boss or the inward freight agent that the vessel would stop discharging cargo at 5:00 p. m. The contrary evidence adduced by the defendant is convincing. The plaintiffs were not told that the vessel would cease discharging operations at 5:00 p. m. or thereabouts.

It was plaintiffs' responsibility to keep themselves advised of the status and

progress of the cargo discharging operation. There was no obligation upon the vessel to take affirmative steps by issuing bulletins or periodic reports or otherwise to keep all of its consignees au courant. The plaintiffs should have had their dock representatives remain on the pier. Instead, Edward Bovino, one of plaintiffs' dock representatives, walked off at 5:00 p. m. while the discharging operation was still under way and after 120 to 140 cases of plaintiffs' chestnuts had already been landed on the pier. The plaintiff Stephen Levatino left the pier at 4:00 p. m.

The evidence presented by the plaintiffs as to the alleged custom or usage relating to cargoes of chestnuts whereby ships work "around the clock" to discharge such cargo was discredited by the defendant's more reliable and impressive testimony to the contrary. Since in fact there was no such custom, it is not necessary to decide the question of law whether any such custom would be binding on the defendant. See Carver, Carriage of Goods by Sea (10th ed., 1957) pp. 686, 689, 690, 692.

■ The defendant acted carefully and prudently throughout. The plaintiffs have failed to sustain their burden of proving by the weight of credible evidence that any acts of the defendant, whether of omission or commission, were negligent or that the defendant was at fault or failed in the performance of any statutory duties and obligations. 46 U.S.C.A. § 1303(2, 8). The defendant and its engaged personnel worked beyond and more than the regular hours.

The vessel was at all times seaworthy. The dry-docking arrangement and its timing were reasonable and proper. That the vessel went in, as it did, for examination and repairs did not violate any obligation owing to the plaintiffs. The vessel discharged 775 of plaintiffs' cases on October 5, 1955; and these were delivered to plaintiffs when they called for them the next day, notwithstanding the fact that plaintiffs had paid freight charges for only 500 cases.

The great bulk, if not the entire balance, of plaintiffs' lots was covered by bills of lading (numbered 17 and 19), representing chestnuts that were stowed in refrigerated or chilled space in hatches No. 2 and No. 3. There is no claim of spoilage. The defendant worked the hatches properly and carefully in all respects.

Under the circumstances of this case, dry-docking was not an unreasonable deviation. The dry-docking was effected with diligence, and the vessel was returned to its pier and resumed discharging of cargo by the morning of Friday, October 7, 1955. The defendant acted at all times with proper care and dispatch.

Moreover, the bills of lading herein covered the contingency of dry-docking (cf. Knauth, Ocean Bills of Lading [4th ed., 1953] 265–266). What was done by defendant satisfied the statutory criteria of "properly and carefully" discharging the plaintiffs' cargo. 46 U.S.C.A. § 1303 (2).

In view of the entirely proper manner of all of defendant's operations and arrangements (including dry-docking), the dry-docking clauses in the four bills of lading covering the plaintiffs' shipments were not rendered inoperative by the provisions of 46 U.S.C.A. § 1303(8).

If, *arguendo*, the dry-docking be characterized as a "deviation", it was a "reasonable deviation." 46 U.S.C.A. § 1304 (4). See Gilmore and Black, The Law of Admiralty (1957) pp. 158–159.

The dry-docking had to be performed at the hours in which it was done because the state of the tide must be taken into consideration as an essential part of the operation. The defendant did not act arbitrarily or improvidently.

Moreover, even if the vessel had remained at Pier 88 on October 6th, it is highly doubtful whether the vessel would have been justified in discharging all of the chestnuts in view of the heavy rain, especially during the hours from 5:00 a. m. to 1:00 p. m. on October 6th. (Exhibit 9, Weather Bureau report.) Had the vessel undertaken to discharge chest-

nuts in the rain there would have been strong likelihood that the vessel would be liable for any damage to the nuts notwithstanding any exculpatory clauses in the bills of lading. Meyer & Brown, Inc. v. Cunard Steamship Co., Ltd., D.C.S.D. N.Y., 1924 A.M.C. 873 (not officially reported); The Africa Maru, 2 Cir., 1932, 54 F.2d 265.

In this case, the plaintiffs have failed to show that any alleged unseaworthy condition was causally connected with the plaintiffs' alleged loss. See The Temple Bar, D.C.D.Md.1942, 45 F.Supp. 608, 613, affirmed 4 Cir., 1943, 137 F.2d 293; Hartford & New York Transp. Co. v. Rogers & Hubbard Co., D.C.D.Conn.1930, 40 F.2d 954, affirmed 2 Cir., 47 F.2d 189, certiorari denied 283 U.S. 835, 51 S.Ct. 483, 75 L.Ed. 1446.

■ Even if it be assumed *arguendo* that the vessel had the burden of proving that it had acted reasonably and had not been guilty of any unreasonable delay in unloading, the defendant more than sustained that onus probandi. The duty resting on the defendant was to unload the cargo within a reasonable time and in a reasonable manner; and this duty was owing to all shippers and not merely to the plaintiffs. See United States Shipping Board Emergency Fleet Corporation v. Florida Grain & Elevator Co., 5 Cir., 1927, 20 F.2d 583, 585; New York & Porto Rico S. S. Co. v. Guanica Centrale, 2 Cir., 1916, 231 F. 820, 826. The defendant fully performed that duty.

It appears clearly that the plaintiffs did not pay the freight charges for the portions of their cargo covered by bills of lading numbered 17 and 19 (Exhibits 6c and 6d) until October 7th and October 10th, by checks issued on October 6th and October 7th (Exhibits 14 and 16). Plaintiffs had paid freight charges on October 5th for only the 500 cases represented by bills of lading numbered 14 and 16 and which cases were included within the 775 cases discharged on October 5th.

It is not necessary to decide whether the bills of lading were effectively modified by the unauthorized oral agreement by defendant's inward freight clerk to permit plaintiffs to take cargo for which freight charges were unpaid. Regardless of that feature and assuming but without deciding that credit had effectively been extended to the plaintiffs, the plaintiffs have failed to establish any basis for relief under any of the other branches of the case.

The following formal findings of fact and conclusions of law are supplemental to and in amplification of the findings and conclusions expressed above.

Findings of Fact

1. The plaintiff, Levatino Company, is a partnership of Anthony Levatino, Stephen Levatino and Joseph Levatino, with offices at 306 Washington Street, New York, New York, and are merchants engaged in the business of importing fresh fruit and produce.

2. During the material times in this action, and in September and October of 1955, the defendant Transatlantic Shipping Corporation was the owner of the T. S. S. Olympia, a vessel of Liberian registry, having a gross tonnage of 17,362.41 and a net tonnage of 13,133.85.

3. At the times involved in this action, defendant Transatlantic Shipping Corporation was and is a foreign corporation engaged in the business of transportation of goods by water. The General Steam Navigation Co. Ltd. of Greece, commonly referred to as "Greek Line", was and is a foreign corporation with an office for the transaction of business in the Borough of Manhattan, City and State of New York.

4. The Greek Line acted as agent for Transatlantic Shipping Corporation, and signed the bills of lading here involved as agent for the master.

5. The within action was originally instituted in the Supreme Court of the State of New York, County of New York, on December 28, 1955 against General Steam Navigation Co. Ltd. of Greece and the Greek Line. Issue was joined on April 10, 1956 and thereafter, on plaintiffs' motion, an order was made in that court to permit the joining of Transat-

760

lantic Shipping Corporation as a party defendant. A supplemental summons and amended complaint were duly served on Transatlantic Shipping Corporation and on July 27, 1956 Transatlantic Shipping Corporation removed the action to this court.

6. This court has jurisdiction of the subject matter of this action, and of the parties thereto.

7. This action is brought by plaintiffs to recover damage alleged to have been sustained by reason of the delayed delivery and shortage of four shipments of chestnuts from Naples, Italy to the Port of New York, via the said vessel.

8. While the Olympia was eastbound in the Mediterranean on her way to Naples, Italy, on September 16, 1955 she apparently struck a submerged object. According to the ship's log, an unusual knocking had been heard near the tail end port shaft on September 16, 1955.

9. The vessel proceeded to Naples. There, on September 18, 1955, examination of the vessel was made by a diver. The diver reported that the propeller was in perfect condition; that slight scratches were on two blades, caused by two halves of rope guard; that the bolts of the rope guard were broken; and "that the ship is able to continue its voyage."

10. The foregoing facts were communicated to the Naples agents of the vessel. The vessel proceeded to her home port, Piraeus, Greece, where she arrived on September 20, 1955.

11. At Piraeus, on September 21, 1955, another examination was made by another diver, whose report substantially corroborated the findings made by the diver in Naples.

12. On September 21, 1955 at Piraeus, and before the vessel broke ground on her westbound voyage, it was decided by the master, in consultation with his company to dry-dock the vessel at the first port available for the purpose of having the bottom of the ship examined.

13. The vessel broke ground on her westbound voyage on September 23, 1955, which also was in accordance with her scheduled sailing time.

14. On September 25, 1955 at Naples, Italy, the Olympia received on board 2,020 cases of chestnuts for shipment to New York under the following bills of lading:

| Bill of Lading No. | Consignee | No. of Cases |
|---|---|---|
| 14 | Levatino Company | 400 |
| 16 | Levatino Company | 100 |
| 17 | "to order" | 1100 |
| 19 | "to order" | 420 |

Bills of lading numbered 17 and 19 were marked: "Goods Stowed in Refrigerator".

15. No advance notice was given to the cargo shippers at Naples or to the consignees at New York that the vessel would be dry-docked sometime after it arrived in New York on October 5, 1955.

16. On or about September 25, 1955 the vessel received on board, as common carrier, at Naples, 2,020 cases containing chestnuts, to be transported to New York in accordance with the terms and conditions of the above-mentioned bill of lading contracts, which were delivered to the shippers of said cases or their agents.

17. When the aforesaid cases were received on board the vessel they were in apparent external good order and condition, except that the cases were frail, and the chestnuts were in sound condition when discharged and delivered.

18. The decision to dry-dock the vessel and instructions to arrange therefor were communicated to the vessel's agents at New York on September 26, 1955. On September 27, 1955 arrangements were concluded with the Bethlehem yard whereby the Olympia was to be picked up at her pier at about 7:00 p. m. on October 5, 1955, and tugboated to the drydock.

19. All cargo loaded onto the Olympia at Naples on or about September 25, 1955, was received on board to be transported in accordance with the terms and conditions of bills of lading, which constituted the respective contracts of carriage and the entire agreement between

the shipper and the carrier. Said contracts provided in part and it was mutually agreed:

"It is agreed that the custody and carriage of the goods are subject to the following terms on the face and back hereof, which shall govern the relations, whatsoever they may be, between shipper, consignee, owner of the goods and holder of the bill of lading and the carrier, master and ship in every possible contingency, wheresoever and whensoever occurring, and also in the event of deviation or of unseaworthiness of the ship at the time of loading or inception of the voyage or subsequently, and none of the terms of this bill of lading shall be deemed to have been waived by the carrier unless by express waiver signed by a duly authorized agent of the carrier.

"In accepting this bill of lading the shipper, consignee and owner of the goods agree to be bound by all of its stipulations, exceptions and conditions, whether written, printed or stamped on the front or back hereof, any local customs or privileges to the contrary notwithstanding. * * *

"The ship may, whenever the carrier or master deem advisable, for matters occurring before, during or after loading, known or unknown at the time of loading or commencement of the voyage, either with or without the goods on board, and before or after proceeding toward the port of discharge, * * * drydock * * *.

"The carrier is not required to deliver said goods at port of discharge or port of destination at any particular time or to meet any particular market, or at any time for any particular use by any particular date or ship * * *.

"The carrier shall not be liable for any consequential or special damage * * *"

20. The vessel was scheduled to arrive at New York, the last port of call on her westbound voyage, on Wednesday, October 5th and to leave New York on her next voyage eastbound on Friday, October 7th.

21. The originals of the bills of lading were presented by Barr Shipping Company, Inc., plaintiffs' Customs brokers, to the Customs House on October 3, 1955. A clearance from Customs was obtained by Barr Shipping. The originals of these four bills of lading were presented by Barr Shipping Company to the Greek Line at their New York offices on October 3, 1955.

22. The Olympia arrived in New York on schedule on October 5, 1955, and was berthed at Pier 88, North River.

23. At such time of arrival, the Olympia was in a seaworthy condition.

24. The 2,020 cases of chestnuts of plaintiffs were distributed between refer space and open stow.

25. Unloading operations began promptly and with due diligence, after the 8:00 a. m. arrival of the ship; and the passengers' baggage and the mail were discharged first.

26. Due notices of arrival with freight bills have been delivered to Levatino Company on October 4, 1955. No notification of arrival was sent on bills of lading Nos. 17 and 19 since they were "order" bills of lading.

27. On the morning of October 5, 1955, one of plaintiffs' dock representatives, Edward Bovino, presented to the defendant's delivery clerk at Pier 88, two papers which are delivery orders covering the merchandise on the four bills of lading in question, and at the same time, the documents of clearance from Customs House were presented to the Customs House representative on Pier 88.

28. The Olympia arrived in the port of New York on schedule on October 5, 1955 and docked at Pier 88, North River, at 8:07 a. m.

29. Discharge of cargo was commenced at 9:00 a. m. October 5, 1955 and was carried on continuously until 7:00 p. m. of that day, when discharge operations were suspended.

The defendant arranged to have all necessary personnel work through the lunch period and for two hours after 5:00 p. m. (5:00 p. m. being the normal stopping time), and paid such personnel overtime wages commencing with the lunchtime.

30. As a consequence of the accelerated pace of unloading, it was necessary to pay the stevedores overtime starting from the meal hour and continuing to the close of the day.

31. By 7:00 p. m., when the unloading operations terminated on October 5, 1955, 775 cases of plaintiffs' chestnuts had been discharged. Plaintiffs did nothing toward removing these chestnuts from the pier, or toward culling out from these cases representative samples for use at the New York fruit auction on October 6, 1955.

32. Plaintiffs' pier representatives made no arrangements to have the chestnuts inspected by representatives of Plant Quarantine of the Department of Agriculture of the United States; they made no inquiry of the pier superintendent or superintendent of stevedores or the hatch bosses as to the probable time of the discharge of their cargo; and they left the pier shortly after the Department of Agriculture inspectors did at or about 4:30 p. m.

33. At the time of the suspension of discharge operations, there remained on board the Olympia a total amount of all cargo that would have required five additional hours for complete discharge.

34. At the time the vessel moved from the pier, there had been discharged 775 cases of plaintiffs' chestnuts; and there still remained on board 1,245 cases of the plaintiffs' chestnuts.

35. All unloading operations on the Olympia ceased by 7:00 p. m.; and the ship thereafter was towed to the Bethlehem Steel Shipyard in Brooklyn for drydocking and examination pursuant to the reservation made with the shipyard on September 27, 1955, and the recommendation of the surveyors.

36. The vessel left Pier 88 for drydock at 8:00 p. m. on October 5, 1955, entered the drydock at 10:15 p. m. on October 5, 1955. She left the drydock at 3:55 a. m. on October 7, 1955 and returned to Pier 88 on October 7, 1955.

37. When the Olympia returned to Pier 88 on October 7, 1955 she commenced discharging cargo at 7:15 a. m. Discharge was completed at 2:00 p. m. on October 7th.

38. During the 1955 chestnut season, public auction sales were regularly held on Tuesdays and Thursdays of each week. Private sales were also arranged. Public auction sales could be arranged for days other than Tuesdays and Thursdays.

39. The Greek Line's inward freight clerk, contrary to the usual practice, and contrary to the express instructions of those in executive authority, on October 6, 1955, at the request of plaintiffs, without payment of freight charges, released the chestnuts covered by bills of lading Nos. 17 and 19. The freight charges for said lots were received respectively on October 7, 1955 and October 10, 1955.

40. Had the Olympia not drydocked on the evening of October 5th, it nevertheless would have been impossible to continue discharging cargo on October 6, 1955 because of the unusually heavy rain on that day, which came in all to over two inches, and which was the heaviest rainfall recorded for that day by the United States Weather Bureau in over eighty years.

41. On October 5, 1955 the defendants were discharging chestnuts when plaintiffs' representatives left the pier, and they made no effort to arrange for delivery of them or samples thereof. One of plaintiffs' representatives, Bovino, saw 120 to 140 cases of chestnuts belonging to plaintiffs on the pier on October 5th about 5:00 p. m. and knew that the ship was continuing to discharge beyond 5:00 p. m. and up to the time the vessel was to be sent from the pier that night for dry-docking.

42. The cargo on the Olympia was discharged with due diligence, and with reasonable dispatch. There was no neg-

ligent delay in the discharge or delivery of the cargo.

43. Under the terms of the bills of lading, it was agreed that the ship could discharge cargo at any time without giving notice of the time the goods were to be discharged, regardless of custom or usage.

44. There was no causal connection between the dry-docking on the night of October 5th and plaintiffs' failure to sell the 775 cases discharged at the fruit auction on the morning of October 6th.

45. The dry-docking of the vessel on the night of October 5th was reasonable under the circumstances; and, in any event, the dry-docking was not the competent or efficient producing cause of plaintiffs' alleged failure to sell their chestnuts at the fruit auction held on the morning of October 6th.

46. Under the circumstances of this case, all of the terms of the bills of lading were binding on the plaintiffs.

47. There is no custom, usage, or practice in the Port of New York to discharge chestnuts overtime and around the clock.

### Conclusions of Law

1. Under the circumstances of this case, the exculpatory clauses of the bills of lading—that the carrier is not required to deliver in time to meet any particular market or at any particular time; that it is not liable for special or consequential damages; and that it might drydock—are lawfully operative and valid, because they in nowise attempt to exempt the carrier from the consequences of negligence, fault or failure to perform any duty owing to the plaintiffs.

2. Under the circumstances of this case, the provision in defendant's bills of lading—that the carrier is not required to give the plaintiffs notice of the time that their goods or any part of them are discharged from the ship—is valid and binding.

3. Defendant did not negligently delay delivery of plaintiffs' consignment on October 5 or October 6, 1955.

4. The dry-docking of the Olympia did not cause plaintiffs' failure to sell their chestnuts at the fruit auction held on the morning of October 6, 1955.

5. Plaintiffs' complaint should be and hereby is dismissed.

The clerk shall forthwith enter judgment accordingly. See United States v. F. & M. Schaefer Brewing Co., 1958, 356 U.S. 227, 232–233, 78 S.Ct. 674, 2 L. Ed.2d 721.