In the Matter of the Complaint of GRACE LINE INC., Plaintiff, as owner of the Steamship SANTA LEONOR, for exoneration from or limitation of liability.

IMPERIAL COMMODITIES CORP. et al., Claimants-Appellants,

v.

GRACE LINE INC., Appellee.

Appeal of the TUPMAN THURLOW CO., INC., et al., Claimants.

Appeal of SEED & FEEDING CORPORATION et al., Claimants.

Nos. 441–443, Dockets 73–2657, 74–1048, 74–1075.

United States Court of Appeals, Second Circuit.

Argued April 7, 1975.

Decided May 20, 1975.

Douglas A. Jacobsen, New York City (Francis M. O'Regan and Bigham Englar, Jones & Houston, New York City, of counsel), for appellants Imperial Commodities Corp., and others.

Raymond P. Hayden, New York City (Robert J. Ryniker and Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, of counsel), for appellants The Tupman Thurlow Co., Inc., and others.

David L. Maloof, New York City (Donovan, Donovan, Maloof & Walsh, New York City, of counsel), for appellants Seed and Feeding Corp., and others.

Lawrence J. Bowles, New York City (Richard H. Sommer and Kirlin, Campbell & Keating, New York City, of counsel), for appellee Grace Line Inc.

Before HAYS, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

On March 31, 1968, as the Santa Leonor was working its way through the narrow and tortuous Patagonian Channels off of the southwest coast of Chile, it stranded on a shoal. Although no lives were lost, the ship and its cargo were beyond salvage.

As a result, claims for lost cargo in excess of two million dollars were made against Grace Line, the owner of the ship; and it is the district court's allowance of that company's claim for exoneration from liability which we now affirm.

The Carriage Of Goods By Sea Act (COGSA), 46 U.S.C. § 1300 et seq., is applicable, and the owner, in making its claim for exoneration, relied on § 1304(2)(a) which provides that neither the carrier nor the ship shall be responsible for loss resulting from the "act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship". Specifically, the owner contended that the sinking resulted from an error in navigation by the Chilean pilot who was·on the bridge or a misunderstanding of the rudder commands given by the pilot to the helmsman.

■ The district court accepted the proof offered by the owner and found that the pilot misjudged the turn and gave the wrong commands or directions and these commands produced too wide a turn, causing the vessel to run aground. We believe this finding has ample support in the evidence.

There was a direct conflict between the pilot and the helmsman concerning the former's commands. The ship, which was proceeding through a narrow channel only 2400 feet in width, was required to make a sharp left turn around an island. The pilot testified with some inconsistency that he commenced this turn with 15 degrees port rudder, reduced it to 10 degrees and then ordered either hard port rudder or more port rudder. The helmsman, on the other hand, steadfastly maintained that the pilot first ordered 10 degrees port rudder and then ordered rudder amidship. The district court found that the pilot never gave a command of hard port rudder or of sufficient rudder to execute the turn properly and that such commands as he gave were indefinite and inadequate for a situation which called for precise directions from the pilot to the helmsman.

■ This was a finding of fact peculiarly within the province of the trial court and which we do not find to be clearly erroneous. McAllister v. United

States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). The ship owner having thus sustained its burden of proof of negli-. gent navigation, the burden then shifted to the cargo owners to establish that the Santa Leonor was unseaworthy and that the unseaworthiness concurred with the negligence to cause the loss. J. Gerber & Company v. S. S. Sabine Howaldt, 437 F.2d 580 (2d Cir. 1971); Director General of India Supply Mission v. S. S. Maru, 459 F.2d 1370 (2d Cir. 1972).

In their efforts to sustain this burden below, appellants made numerous claims of unseaworthiness, including defective steering mechanism, improper stowage and trim, defective hatch covers, incompetent lookout and helmsman and inadequate and unqualified pilotage. All of these were rejected by the district court, and none is urged in this court except as relates to the pilot.

In brief, it is the contention of appellants that the Santa Leonor should have had two pilots instead of one for its passage through the Straits of Magellan and the Patagonian Channels and that the single pilot who was provided was incompetent because he did not know the turning radius of the vessel.

The voyage of the Santa Leonor commenced at Rio de Janeiro on March 16, 1968. Cargo was loaded at that port and also at Santos, Paranagua and Buenos Aires. The ship arrived at Possession Bay on the Atlantic Ocean entrance to the Straits of Magellan on March 30, 1968 where it took on a pilot assigned to it from a rotation list maintained by the Department of Litoral of the Chilean Navy. The request for the pilot was made to the Director of Litoral by appellee's agent in Valparaiso.

■ COGSA imposes upon a carrier the duty to exercise reasonable diligence to have its ship seaworthy and properly manned, "before and at the beginning of the voyage". 46 U.S.C. § 1303. As to specific cargo, a voyage is generally held to begin when that cargo is lifted. Un-

ion Carbide & Carbon Corp. v. United States, 200 F.2d 908 (2d Cir. 1953).

■ An exception to this rule was spelled out in May v. Hamburg-Amerikanische Gesellshaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348 (1933), where the carrier resumed the management of the ship at a subsequent port. Cases which follow *May* have had some difficulty in determining what constitutes such intervening management and control by the carrier as would destroy the continuity of the voyage. See, e. g., Mississippi Shipping Co. v. Zander & Co., 270 F.2d 345 (5th Cir. 1959), vacated as moot, 361 U.S. 115, 80 S.Ct. 212, 4 L.Ed.2d 148 (1959) and Isthmian Steamship Co. v. California Spray-Chemical Corp., 290 F.2d 486 (9th Cir. 1961).[1] However, if any such problem existed in the instant case, it did not seem to concern either counsel or the court below, all of whom apparently concluded that the last voyage of the Santa Leonor began when it left Possession Bay. Cf. The Oritani, 40 F.2d 522 (E.D.Pa.1929), aff'd 54 F.2d 1075 (3d Cir. 1931). Since the district judge found that the Santa Leonor was seaworthy at that time and since we find his conclusion to be justified, we need not attempt to settle an issue which has not been raised.

■ When the Santa Leonor took on a single pilot, it was complying with the regulations of the Chilean government. While the scope of appellee's duty was not necessarily measured by the regulations as they then existed, Schlichter v. Port Arthur Towing Co., 288 F.2d 801 (5th Cir. 1961), cert. den. 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961), neither was it enlarged *nunc pro tunc* by subsequent amendments which required two pilots. There was adequate proof of a custom and practice of using only one pilot and expert testimony to justify such usage. Cf. Asbestos Corp. Ltd. v. Compagnie de Navigation, etc., 480 F.2d 669 (2d Cir. 1973). Indeed, there was testimony that after the Chilean regulations were amended, exemp-

1. See also modified opinion, 300 F.2d 41, 49 (9th Cir. 1962).

tions from the two-pilot requirements were often granted.

Assuming that it would have been better practice for the Santa Leonor to have had two pilots, causal relationship must still be established between the absence of the second pilot and the stranding of the ship. Firestone Synthetic Fibers Co. v. M/S Black Heron, 324 F.2d 835 (2d Cir. 1963); Director General of India Supply Mission v. S. S. Maru, *supra*. Appellants attempted to establish such causal relation by expert testimony that the single pilot who had been on board for sixteen hours prior to the stranding must have been subject to the stresses of fatigue. However, the proof showed that the pilot was on the bridge for only seven and one-half hours and rested during the balance of the time. In addition, the pilot himself testified that he felt well at the time of the accident which occurred only two hours after he resumed the bridge following a period of rest. There was ample support for the trial court's finding that the pilot had adequate periods of rest and was not fatigued at the time of the accident.

The preponderance of the testimony indicated no necessity for two pilots to be on the bridge at the same time in the passage where the ship stranded, and the trial court so found.

We agree with Judge Griesa that appellants' reliance on 46 U.S.C. § 223, as establishing a statutory duty or standard for pilots, is misplaced. That statute, which required appellee to have three licensed mates on board who shall stand in three watches, was fully complied with. There is nothing in its provisions which indicates a need for three pilots in addition to the three mates. Indeed, appellants herein only urge a need for two.

In The Denali, 105 F.2d 413 (9th Cir. 1939), opinion adhered to on rehearing, 112 F.2d 952 (9th Cir. 1940), cert. den. 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444 (1940), the court specifically limited the application of 46 U.S.C. § 223 to mates and distinguished it from 46 U.S.C. § 235 which limits the duty of licensed officers to no more than twelve hours of any twenty-four at sea. If standards of conduct are to be established by reference to inapplicable statutes, and we do not suggest this as a proper mode of proof, § 235 would seem to be more pertinent to the facts of the instant case than would § 223.

Appellants' claim of pilot incompetence is based on the pilot's testimony that he had not previously piloted a ship of the same type as the Santa Leonor and that he was "not exactly" acquainted with its turning radius. Interestingly enough, exploration of the subject ended right there. Although a simple series of questions could readily have established whether this lack of knowledge was a contributing factor in the stranding, they were not asked. The trial court correctly found, therefore, that appellants did not establish this to be so.

It must be remembered, also, that the pilot was a man with many years of experience and a reputation for competency who was assigned to the vessel by the Chilean government. In the light of this prima facie showing of training and capacity, appellants were required to show some lack of diligence on the part of appellee in accepting this apparently competent individual. The Buckleigh, 31 F.2d 241 (2d Cir. 1929), cert. den. 280 U.S. 564, 50 S.Ct. 25, 74 L.Ed. 618 (1929). This they did not do.

Appellants' final claim of error arises from the failure of appellee to produce the deck log books and charts and its production of a gyro course recorder tape from which several days' records had been torn, including those for the day of the stranding. They contend that the district court erred in declining to draw an adverse inference against appellee from the disappearance of these records.

The Santa Leonor stranded in the middle of the night in a remote and inaccessible area off the southern tip of South America. Preoccupied with the exigencies of getting his crew and passengers

to safety, the captain left the ship without taking its records with him. His attempt to return to the ship later in the day was thwarted by the wind and the current.

Salvage experts, representing appellee and various cargo interests, visited the vessel in April and May of 1968, but they were not instructed to search for the ship's records and did not do so. Subsequently, a diver, retained by appellee's attorneys for the specific purpose of locating the records, searched the hull and came back empty-handed except for the damaged course recorder. According to the diver, the ship had been ransacked and almost everything of value had been taken. Clearly, looters had been on board.

This situation is very much like that which existed in The Temple Bar, 45 F.Supp. 608 (D.Md.1942), aff'd 137 F.2d 293 (4th Cir. 1943), where the court, on a similar state of facts, refused to find a presumption against the carrier because of wire missing from a sounding apparatus. See also President of India v. West Coast Steamship Co., 213 F.Supp. 352 (D.Ore. 1962), aff'd 327 F.2d 638 (9th Cir. 1964), cert. den. 377 U.S. 924, 84 S.Ct. 1222, 12 L.Ed.2d 216 (1964).

The district court found that there was simply no way to tell whether the records of the Santa Leonor were removed by appellee, by cohorts of the pilot or by someone else. Without proof of control by appellee, either at the time of trial or when the records disappeared, no inference can be drawn from its failure to produce them. Savard v. Marine Contracting Inc., 471 F.2d 536 (2d Cir. 1972), cert. den. 412 U.S. 943, 93 S.Ct. 2778, 37 L.Ed.2d 404 (1973); Slan v. A/S Det Danske-Franske D/S, 479 F.2d 288 (5th Cir. 1973).

In summary, we find the decision of the district court to be sound, well reasoned, and amply supported by the proof. We therefore affirm.